08-4917-cv
Alliance for Open Society International v. U.S. Agency
for International Development

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: December 9, 2010                     Decided: July 6, 2011)

Docket No. 08-4917-cv

_____

ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., PATHFINDER INTERNATIONAL, GLOBAL HEALTH COUNCIL, INTERACTION,

*Plaintiffs-Appellees*,

OPEN SOCIETY INSTITUTE,

*Plaintiff*,

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, RAJIV SHAH,[*] in his official capacity as Administrator of the U.S. Agency for International Development, and his successors, UNITED STATES CENTERS FOR DISEASE CONTROL AND PREVENTION, THOMAS R. FRIEDEN, in his official capacity as Director of the U.S. Centers for Disease Control and Prevention, and his successors, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services, and her successors,

*Defendants-Appellants*.[**]

Before: STRAUB, POOLER, and B.D. PARKER, *Circuit Judges*.

_____

---

[*] Named officials have been substituted for their predecessors pursuant to Fed. R. App. P. 43(c)(2).

[**] The Clerk of Court is directed to amend the official caption to read as shown above.

Appeal from preliminary injunctions entered by the United States District Court for the Southern District of New York (Marrero, *J.*) enjoining Defendants-Appellants from enforcing 22 U.S.C. § 7631(f), a provision of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, 22 U.S.C. § 7601 *et seq.*, against Plaintiffs-Appellees, on the ground that § 7631(f), as applied to Plaintiffs-Appellees, violates the First Amendment.

AFFIRMED.

Judge Straub dissents in a separate opinion.

_____

REBEKAH DILLER, Brennan Center for Justice at NYU School of Law, New York, NY (Laura K. Abel, Alicia L. Bannon, David S. Udell, Brennan Center for Justice at NYU School of Law, New York, NY; David W. Bowker, Sue-Yun Ahn, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Jason D. Hirsch, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees.*

BENJAMIN H. TORRANCE, Assistant United States Attorney for the Southern District of New York (David S. Jones, Assistant United States Attorney, *of counsel*; Preet Bharara, United States Attorney, *on the brief*), *for Defendants-Appellants.*

Lenora M. Lapidus, Women's Rights Project, American Civil Liberties Union, New York, NY (Mie Lewis, Women's Rights Project, American Civil Liberties Union, New York, NY; Arthur N. Eisenberg, Alexis Karterton, New York Civil Liberties Union, New York, NY; James Esseks, Rose Saxe, LGBT and AIDS Project, American Civil Liberties Union, New York, NY, *on the brief*), *for Amici Curiae American Humanist Association and 24 Other Public Health and Human Rights Organizations and Experts.*

Lawrence S. Lustberg (Eileen M. Connor, *on the brief*), Gibbons P.C., Newark, NJ, *for Amicus Curiae Independent Sector.*

BARRINGTON D. PARKER, *Circuit Judge*:

Defendants-Appellants the U.S. Agency for International Development ("USAID"), the U.S. Department of Health and Human Services ("HHS"), and the U.S. Centers for Disease Control and Prevention ("CDC") (collectively, the "Agencies" or "Defendants") appeal from preliminary injunctions entered by the United States District Court for the Southern District of New York (Marrero, *J*.). The district court enjoined the Agencies from enforcing 22 U.S.C. § 7631(f), a provision of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), 22 U.S.C. § 7601 *et seq.*, against Plaintiffs-Appellees Alliance for Open Society International, Inc. ("AOSI"), Pathfinder International ("Pathfinder"), Global Health Council ("GHC"), and InterAction. These are non-governmental organizations ("NGOs") engaged in the international fight against HIV/AIDS that receive funding under the Act.

Section 7631(f) of the Leadership Act provides that "[n]o funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution." This provision, as construed and implemented by the Agencies, requires NGOs, as a condition of receiving Leadership Act funds, to adopt a policy explicitly opposing prostitution, and prohibits recipients from engaging in any activities that are "inconsistent" with an anti-prostitution stance. Certain other recipients of Leadership Act funds, such as the World Health Organization, are not bound by this restriction.

As explained below, we conclude that § 7631(f), as implemented by the Agencies, falls well beyond what the Supreme Court and this Court have upheld as permissible conditions on the receipt of government funds. Section 7631(f) does not merely require recipients of

3

Leadership Act funds to refrain from certain conduct, but goes substantially further and compels recipients to espouse the government's viewpoint. *See* 45 C.F.R. § 89.1. Consequently, we agree with the district court that Plaintiffs have demonstrated a likelihood of success on the merits. Finding no abuse of discretion by the district court, we affirm.

**BACKGROUND**

**The Leadership Act**

In 2003, Congress passed the Leadership Act "to strengthen and enhance United States leadership and the effectiveness of the United States response to the HIV/AIDS, tuberculosis, and malaria pandemics." 22 U.S.C. § 7603 (Supp. III 2009).[1] The Act designates several avenues through which this international campaign is to be run, including "5-year, global strategies"; the development of vaccines and treatments; and "public-private" partnerships between federal agencies and NGOs, which Congress recognized "have proven effective in combating the HIV/AIDS pandemic." §§ 7601(18), 7603.

The Act reflects Congress's concern with the social, cultural, and behavioral causes of HIV/AIDS. *See* § 7601(15). Section 7601(23), one of forty-one congressional "findings" set forth in § 7601, addresses prostitution: "Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices. The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/AIDS epidemic."

---

[1] The Leadership Act was reauthorized and amended in 2008. Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008, Pub. L. No. 110-293, 122 Stat. 2918; *see* 22 U.S.C. § 7671. We cite to the current version of the Act.

Congress imposed two prostitution-related conditions on Leadership Act funding. First, it specified that no funds made available to carry out the Act may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. § 7631(e). Second, it imposed a Policy Requirement, which specifies that:

> No funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.

§ 7631(f). This litigation involves only the Policy Requirement. Plaintiffs do not challenge the Requirement's "sex trafficking" component.

**Defendants' Initial Implementation of the Policy Requirement**

The defendant Agencies implement the Leadership Act by, in part, funding U.S.-based NGOs involved in the international fight against HIV/AIDS. AOSI and Pathfinder are two such organizations. AOSI runs a program in Central Asia that aims to prevent the spread of HIV/AIDS by reducing injection drug use, while Pathfinder works to stem the spread of HIV/AIDS by providing family planning and reproductive health services in more than twenty countries. Both receive funding from sources other than the Agencies and neither supports prostitution. But their work does involve engaging, educating, and assisting groups, such as prostitutes, that are vulnerable to HIV/AIDS, as well as advocating approaches and discussing strategies for fighting HIV/AIDS among prostitutes at, among other places, policy conferences and forums.

5

After the Leadership Act was enacted, the Department of Justice's Office of Legal Counsel ("OLC") warned that applying the Policy Requirement to U.S.-based organizations would be unconstitutional. Heeding that warning, Defendants initially refrained from enforcing it against U.S.-based NGOs. OLC subsequently changed course and withdrew what it characterized as its prior "tentative advice," asserting that "there are reasonable arguments to support the[] constitutionality" of applying the Policy Requirement to U.S.-based organizations, and, starting in mid-2005, the Agencies began applying the Requirement to U.S.-based grantees. Specifically, USAID issued a directive requiring that U.S.-based organizations, as a condition of receiving funding under the Act, "must have a policy explicitly opposing prostitution." Defendants also construed the Policy Requirement as prohibiting grantees from engaging in activities that were inconsistent with a policy opposing prostitution. In an effort to remain eligible for Leadership Act funding, both AOSI and Pathfinder adopted policy statements. Pathfinder's, for example, stated that it "opposes prostitution and sex trafficking because of the harm they cause primarily to women."

**The District Court's First Decision**

In 2005, AOSI and Pathfinder sued the Agencies, contending that conditioning Leadership Act funding on the affirmative adoption of a policy opposing prostitution violated the First Amendment by compelling grantees to adopt and voice the government's viewpoint on prostitution, and by restricting grantees from engaging in privately funded expression that the Agencies might deem insufficiently opposed to prostitution. They also asserted that the Policy Requirement was unconstitutionally vague with respect to what sorts of prostitution-related activity and expression were, in fact, restricted.

The district court granted AOSI and Pathfinder preliminary injunctive relief. *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222 (S.D.N.Y. 2006) ("*Alliance I*"). The court engaged in a thorough analysis of the Supreme Court's "unconstitutional conditions" jurisprudence—focusing, in particular, on *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), and *Rust v. Sullivan*, 500 U.S. 173 (1991). The court first concluded that, because the Policy Requirement substantially impaired First Amendment protected activity conducted by private entities with private funds as a condition of receiving a government benefit, heightened scrutiny was warranted. *Alliance I*, 430 F. Supp. 2d at 259. The court then concluded that the Policy Requirement, as applied to AOSI and Pathfinder, violated the First Amendment because it was not narrowly tailored, imposed a viewpoint-based restriction on their use of private funds without allowing for adequate alternative channels of communication, and "compel[led] speech by affirmatively requiring [them] to adopt a policy espousing the government's preferred message." *Id.* at 268-76. Accordingly, the court held that AOSI and Pathfinder had demonstrated a likelihood of success on the merits, and had met their burden of showing irreparable harm. *Id.* at 276, 278. The district court thus preliminarily enjoined Defendants from enforcing the Policy Requirement against AOSI or Pathfinder, and Defendants appealed.

**The First Appeal**

During the course of the first appeal, the Agencies informed us that HHS and USAID were developing guidelines that would allow grantees to establish or work with separate affiliates that would not be subject to the Policy Requirement. The Agencies were of the view that the guidelines would satisfactorily address the relevant constitutional concerns in

7

accordance with our decision in *Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219, 223-24 (2d Cir. 2006) ("[I]n appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression."). After the guidelines became effective, we remanded the case to the district court to determine in the first instance whether interlocutory relief continued to be appropriate. *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 254 F. App'x 843, 846 (2d Cir. 2007) ("*Alliance II*").

**The Guidelines**

The Guidelines permit recipients of Leadership Act funds to partner with affiliate organizations that do not comply with the Policy Requirement, provided that the recipient and affiliate maintain "adequate separation" so as not to "threaten the integrity of the Government's programs and its message opposing prostitution." HHS Guidance, 72 Fed. Reg. 41,076 (July 26, 2007); USAID Acquisition & Assistance Policy Directive ("AAPD") 05-04 Amendment 1 (July 23, 2007). The Guidelines (which, as discussed *infra*, were slightly revised in 2010), require recipients to have "objective integrity and independence" from any affiliate that "engages in activities inconsistent with [an] opposition to the practice[] of prostitution . . . ('restricted activities')." 45 C.F.R. § 89.3 (2010).

The Guidelines, as initially promulgated, provided that a recipient would be deemed to have "objective integrity and independence"—i.e., adequate separation—from an affiliate if (1) the two entities are legally separate; (2) no Leadership Act funds are transferred to the affiliate or used to subsidize its restricted activities; and (3) the entities are physically and financially separate. 72 Fed. Reg. at 41,076. The 2007 Guidelines elaborated that "whether sufficient

8

physical and financial separation exists" would be determined "case-by-case," and set forth five, non-exclusive factors relevant to that determination: (i) the existence of separate personnel, management, and governance; (ii) the existence of separate accounts and records; (iii) the degree of separation between the recipient's facilities and facilities used by the affiliate to conduct restricted activities; (iv) the extent to which signs and other forms of identification distinguish the two entities; and (v) the extent to which the government and the Leadership Act program are "protected from public association with the affiliated organization and its restricted activities." *Id.* at 41,077.

**The District Court's Second Decision**

On remand, AOSI and Pathfinder moved to amend the complaint to add Global Health Council and InterAction (together, the "Associations") as plaintiffs, and to extend the preliminary injunction to cover the Associations. GHC is an alliance of organizations dedicated to international public health. InterAction is an alliance of international development and humanitarian NGOs. Many of the Associations' U.S.-based members—which include Pathfinder, a member of both GHC and InterAction—participate in the international fight against HIV/AIDS, receive Leadership Act funding, are therefore subject to the Policy Requirement, and desire relief from it. These member organizations' HIV/AIDS-prevention work includes administering health services and other programs that expressly target at-risk groups like prostitutes. They also engage in advocacy and discussion concerning controversial global health issues—for example, best practices for reducing HIV/AIDS among prostitutes—at policy forums and conferences.

9

In August 2008, the district court permitted GHC and InterAction to join the litigation, extended the preliminary injunction to them, and went on to consider whether interlocutory relief continued to be warranted in light of the Guidelines. *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533 (S.D.N.Y. 2008) ("*Alliance III*"). The court held that it was, concluding that the Guidelines did not affect its previous determination that the Policy Requirement impermissibly compelled speech. The court reasoned that "[w]hile the Guidelines may or may not provide an adequate alternate channel for Plaintiffs to express their views regarding prostitution," the clause requiring them to espouse the government's viewpoint "remains intact." *Id.* It also concluded that heightened scrutiny remained applicable because the Policy Requirement discriminates based on viewpoint, and that the Guidelines were too burdensome to cure the Requirement's constitutional defects. *Id.* at 546-49. Accordingly, the court declined to disturb its preliminary injunction. Defendants appealed from both the 2006 and 2008 preliminary injunction orders.

**Additional Guidance Promulgated by Defendants**

In April 2010, while this appeal was pending, HHS and USAID promulgated further guidance pertaining to the Policy Requirement—HHS in a formal regulation, USAID in a policy directive. HHS, Organizational Integrity of Entities That Are Implementing Programs and Activities Under the Leadership Act, 75 Fed. Reg. 18,760 (Apr. 13, 2010) (codified at 45 C.F.R. pt. 89); USAID AAPD 05-04 Amendment 3 (Apr. 13, 2010). The new guidance specifies that in order to comply with the Policy Requirement, a Leadership Act grantee must affirmatively state in the funding document that it is "opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women, men, and children," 45

10

C.F.R. § 89.1; AAPD 05-04 Amend. 3 at 2, and reaffirms that a recipient "cannot engage in activities that are inconsistent with [its] opposition to prostitution," 75 Fed. Reg. at 18,760. Neither the 2010 nor the 2007 guidance offers recipients insight as to what activities may be deemed "inconsistent" with an "opposition to prostitution."

The new guidance also modified the Guidelines for partnering with an affiliate that does not comply with the Policy Requirement. *See* 45 C.F.R. § 89.3. For example, under the revised Guidelines, which profess to "allow more flexibility for funding recipients," 75 Fed. Reg. at 18,762, legal separation is no longer required but only one factor to be considered, and separate management is no longer expressly identified as a relevant factor, in determining whether a recipient has "objective integrity and independence" from an affiliate, 45 C.F.R. § 89.3.

**DISCUSSION**

**I.     Standing**

The Agencies initially argue that Plaintiffs lack standing. Plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Because standing is challenged [here] on the basis of the pleadings, we accept as true all material allegations of the complaint, and must construe the complaint in favor of [Plaintiffs]." *W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (internal quotation marks omitted). We review questions of standing de novo. *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

Three elements comprise the "irreducible constitutional minimum" of standing: (1) the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2)

11

there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

Because GHC and InterAction are suing on behalf of their members, each must establish associational standing by demonstrating that (a) at least one of the association's members would otherwise have standing to sue in its own right—i.e., has constitutional standing; (b) the interests the association seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). The district court held that Plaintiffs had established standing. As explained below, we conclude that the district court was correct.

**A.    Injury-in-Fact**

We have little difficulty finding that Plaintiffs have alleged constitutional injury-in-fact, and face actual or imminent harm as a result of the Policy Requirement. They allege that the Requirement has compelled AOSI, Pathfinder, and many of the Associations' members to adopt policy statements that they otherwise would not have adopted, and that it restricts them from engaging in privately funded activities and speech that is essential to their work but that the Agencies might deem inconsistent with an opposition to prostitution.[2] Pathfinder, for example, "wishe[s] to remain neutral" on the issue of prostitution, but adopted an anti-prostitution policy statement in order to avoid losing Leadership Act funding, and alleges that it would, in the

---

[2] Plaintiffs allege that twenty of GHC's members and twenty-eight of InterAction's members have adopted anti-prostitution policy statements that they did not wish to make.

12

absence of the injunctions, self-censor its prostitution-related speech at conferences, in publications, and on its website.

Defendants contend that the alleged injuries are merely conjectural because no plaintiff has "attempted to form an affiliate" and "avail [itself] of th[at] alternative avenue[] for communication." Appellants' Br. 22-23. But standing jurisprudence makes clear that Plaintiffs need not go through the potentially burdensome process of setting up an affiliate organization before they can bring a First Amendment challenge. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (finding standing where newly enacted statute had not yet been enforced because compliance would have required plaintiffs "to take significant and costly . . . measures," and "the alleged danger of th[e] statute [was], in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution"). Moreover, as elaborated upon below, *infra* at [33-34], forming an affiliate cannot remedy the grantee's injury resulting from being compelled to affirmatively state the government's position on prostitution.

**B. Associational Standing**

Defendants contend that GHC and InterAction lack associational standing because they fail the third prong of the *Hunt* test, under which they must establish that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. We disagree. As an initial matter, the third prong of the associational standing test is "prudential," not constitutional, and is "best seen as focusing on . . . matters of administrative convenience and efficiency." *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 555-56 (1996). Accordingly, district courts possess a degree of discretion in applying it. *See Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002)

13

(Sotomayor, J.) ("[T]he prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial self-restraint further to protect, to the extent necessary under the circumstances, the purpose of Article III." (internal quotation marks omitted)).  Here, the district court correctly concluded that "neither the claims asserted nor the relief requested by the Associations would require any significant participation of individual members in the lawsuit." *Alliance III*, 570 F. Supp. 2d at 543.

We agree with the district court that the "relief requested" component of the third *Hunt* prong has been satisfied because the Associations seek an injunction barring enforcement of the Policy Requirement, which will not necessitate the participation of individual members in the lawsuit.  *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (when an association seeks equitable relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured").  However, as the Agencies correctly assert, the third prong of the *Hunt* test is not "automatically satisfie[d]" whenever an association "request[s] equitable relief rather than damages." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004).  Courts "also must examine the claims asserted to determine whether they require individual participation." *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993); *see Bano*, 361 F.3d at 714 ("[An] organization lacks standing to assert claims of injunctive relief on behalf of its members where the fact and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof . . . ." (internal quotation marks omitted)).

14

The Agencies argue that "[i]ndividualized proof is required" in this case because resolving whether the Guidelines permit recipients to set up adequate alternative channels for protected expression necessitates a fact-specific determination for each recipient. Appellants' Br. 25. First, it is self-evident that, as the district court concluded, individualized proof is *not* required for the compelled speech and vagueness claims, "as it is the conduct of Defendants in the form of the Policy Requirement and the Guidelines that will be the primary subject of inquiry." *Alliance III*, 570 F. Supp. 2d at 543. With respect to the adequate alternative channels analysis, we agree with the district court that while it will "require a more thorough factual development to establish the extent of the burden on the Associations' members," individualized evidence of members' efforts to comply with the Guidelines "would be duplicative and redundant[,] counsel[ing] in favor of granting associational standing in the interests of judicial economy." *Id.* at 544; *see Nat'l Ass'n of Coll. Bookstores v. Cambridge Univ. Press*, 990 F. Supp. 245, 250 (S.D.N.Y. 1997) ("The fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing."). This reasoning finds support in *Hunt* itself, which held that an association of apple growers had standing to challenge a statute, notwithstanding the varied nature and extent of the burdens suffered by the association's members in complying with the statute. *See* 432 U.S. at 343-44. Accordingly, we conclude that GHC and InterAction have adequately alleged associational standing.

**II. Preliminary Injunctions**

We review the grant of a preliminary injunction for abuse of discretion. *Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 100 (2d Cir. 2008). "A district court abuses its discretion when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its

15

decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Mullins v. City of New York*, 626 F.3d 47, 51 (2d Cir. 2010) (internal quotation marks omitted). Where, as here, the moving parties seek to "stay[] government action taken in the public interest pursuant to a statutory or regulatory scheme," they must establish (1) a likelihood of success on the merits, and (2) irreparable harm in the absence of an injunction. *Alleyne*, 516 F.3d at 100 (internal quotation marks omitted); *accord Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009). Ultimately, "[i]f the underlying constitutional question is close, . . . we should uphold the injunction." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 185 (2d Cir. 2010) (alteration in original) (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664 (2004)).

On appeal, Defendants challenge the district court's determination that Plaintiffs are likely to succeed on the merits. They do not contest the district court's finding of irreparable harm. We conclude that Plaintiffs have demonstrated a likelihood of success on the merits because the Policy Requirement likely violates the First Amendment by impermissibly compelling Plaintiffs to espouse the government's viewpoint on prostitution.

**A. The Policy Requirement Likely Violates the First Amendment**

**1. Spending Clause and Unconstitutional Conditions Jurisprudence**

The Spending Clause of the Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This provision allows Congress to "condition[] [the] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)

(quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). It is well settled that Congress is entitled to further policy goals indirectly through its spending power that it might not be able to achieve by direct regulation. *See id.* at 207 ("[O]bjectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." (internal quotation marks and citation omitted)). Congress's power under the Spending Clause is broad, as "the constitutional limitations on Congress when exercising its spending power are less exacting than those on its authority to regulate directly." *Id.* at 209.

Defendants contend that because the Leadership Act is a Spending Clause enactment, and Plaintiffs are free to decline funding if they do not wish to comply with its conditions, the Policy Requirement should be subjected to only minimal scrutiny under *Dole*. But Congress's spending power, while broad, is not unlimited, and other constitutional provisions may provide an independent bar to the conditional grant of federal funds. Pursuant to this "unconstitutional conditions" doctrine, as it has come to be known, the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). As the Supreme Court recently reiterated, "the government may not deny a benefit to a person on a basis that infringes his

17

constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit."

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("*FAIR*") (internal quotation marks omitted).

This tension between the breadth of Congress's spending power on one hand and the principle that a condition on the receipt of federal funds may not infringe upon the recipient's First Amendment rights on the other has given rise to three seminal Supreme Court decisions and several related cases from our Circuit. The Supreme Court cases are *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), and *Rust v. Sullivan*, 500 U.S. 173 (1991). Our cases include a series of decisions concerning conditions imposed upon recipients of funding from the Legal Services Corporation ("LSC"): *Velazquez v. Legal Services Corp.*, 164 F.3d 757 (2d Cir. 1999) ("*Velazquez I*"), *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ("*Velazquez II*"), and *Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219 (2d Cir. 2006) ("*BLS*").

In *Regan*, plaintiff Taxation With Representation ("TWR"), a nonprofit lobbying corporation, challenged a statute that denied tax deductions to organizations that engaged in "substantial lobbying." 461 U.S. at 541, 544; *see* 26 U.S.C. § 501(c)(3). TWR argued that the prohibition against substantial lobbying by § 501(c)(3) organizations imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Supreme Court disagreed, concluding that TWR remained free to receive deductible contributions to support its nonlobbying activity, and could create a separate, tax-exempt affiliate under § 501(c)(4) to pursue its lobbying activity. *Id.* at 544-45. Given that alternative, the Court concluded that Congress "ha[d] not infringed any First Amendment rights or regulated any First Amendment

18

activity," but "simply chosen not to pay for TWR's lobbying." *Id.* at 546. In a concurring opinion, Justice Blackmun emphasized "the saving effect of § 501(c)(4)," stating his view that "§ 501(c)(3) alone" would be "constitutional[ly] defect[ive]," but that "[a] § 501(c)(3) organization's right to speak is not infringed, because it is free to [lobby] through its § 501(c)(4) affiliate without losing tax benefits for its nonlobbying activities." *Id.* at 552-53 (Blackmun, J., concurring).

The following term, the Supreme Court decided *League of Women Voters*, which involved a First Amendment challenge to a provision in the Public Broadcasting Act that prohibited stations receiving federal funds from "editorializing." 468 U.S. at 367. The Court struck down the provision, troubled by the fact that it "barred [a grantee] from using even wholly private funds to finance its editorial activity." *Id.* at 400 (stating that "unlike the situation faced by [TWR], a [station] that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing"). The Court noted, however, that if recipients were permitted "to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of [*Regan*]," as the recipient "would be free, in the same way that [TWR] was free, to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities." *Id.*

The Supreme Court elaborated on these themes in *Rust*, which involved a facial challenge to HHS regulations implementing Title X of the Public Health Service Act. 500 U.S. at 177-78. Title X authorizes HHS to make grants to organizations to help them run "family planning projects," but provides that no Title X funds "shall be used in programs where abortion is a

19

method of family planning." *Id.* at 178 (quoting 42 U.S.C. §§ 300(a), 300a-6). The HHS regulations prohibited Title X projects from providing abortion counseling or referrals, or engaging in any activities that encourage, promote, or advocate abortion as a method of family planning. *Id.* at 179-80. However, the regulations allowed grantees to engage in abortion-related activities as long as their Title X projects maintained "objective integrity and independence" from such activities—a determination to be made by HHS based on factors such as the existence of separate personnel, and the degree of separation between the Title X project and facilities used for restricted activities. *Id.* at 180-81 (quoting 42 C.F.R. § 59.9 (1989)). The *Rust* plaintiffs argued that the regulations violated the First Amendment because they "discriminat[ed] based on viewpoint [by] prohibit[ing] all discussion about abortion as a lawful option," and because they conditioned the receipt of Title X funds on relinquishing the right to engage in abortion-related speech. *Id.* at 192, 196 (internal quotation marks omitted).

The Supreme Court disagreed, concluding that "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* at 193 ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."). It held that the regulations "do not force the Title X grantee to give up abortion-related speech," but "merely require that the grantee keep such activities separate and distinct from Title X activities." *Id.* at 196. The Court emphasized that this was unlike the funding condition found unconstitutional in *League of Women Voters*, where "the Government ha[d] placed [the]

20

condition on the *recipient* of the subsidy rather than on a particular program or service." *Id.* at 197 (emphasis in original).

We turn now to three decisions of this Court arising under the Legal Services Corporation Act of 1974, pursuant to which the LSC makes grants to local organizations that provide free legal assistance to indigent clients. *Velazquez I*, 164 F.3d at 759. In 1996, Congress passed legislation barring LSC grants to entities that engage in certain activities, such as lobbying or class actions, thereby "restrict[ing] grantees' use of non-federal and federal funds alike." *Id.* at 760. In order to cure the "constitutional infirmities" of the 1996 restrictions, LSC issued "program integrity" regulations, modeled after those upheld in *Rust*, allowing grantees to affiliate with organizations that did engage in prohibited activities, as long as the entities maintained adequate physical and financial separation. *Id.* at 761-62.

In *Velazquez I*, we considered a facial challenge to the 1996 statute and LSC regulations, which the plaintiffs argued "impermissibly burden[ed] grantees' exercise of First Amendment activities," and "constitut[ed] a viewpoint-based restriction on expression." *Id.* at 763. Judge Leval, writing for the majority, synthesized *Regan*, *League of Women Voters*, and *Rust* as establishing "that, in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Id.* at 766. The facial challenge therefore failed, because although the affiliate option might, as applied to some LSC grantees, prove unduly burdensome, there was no reason to think this would be true for all grantees. *Id.* at 767. However, one provision in the 1996 statute, which prohibited grantees from representing clients challenging existing welfare law, was held invalid as impermissible viewpoint discrimination. *Id.* at 769-72.

21

The Supreme Court affirmed our invalidation of that viewpoint-based restriction in *Velazquez II*. 531 U.S. at 540-41. The Court interpreted *Rust* as having implicitly "reli[ed] on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech," explaining that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government use[s] private speakers to transmit information pertaining to its own program." *Id.* at 541 (internal quotation marks and citation omitted). The *Velazquez II* Court held, however, that the LSC program, unlike Title X, was not "designed . . . to promote a governmental message," as an LSC-funded lawyer "is not the government's speaker," but rather "speaks on the behalf of his or her private, indigent client." *Id.* at 542. Therefore, *Rust* did not save the viewpoint-based restriction on seeking welfare reform. The Court declined to review the portion of *Velazquez I* that had upheld the LSC's program integrity regulations. 532 U.S. 903 (2001) (Mem.) (denying certiorari).

Following *Velazquez II*, the *Velazquez* plaintiffs brought an as-applied challenge to the LSC regulations. *BLS*, 462 F.3d at 224. The district court enjoined application of the regulations, reasoning that they imposed an "undue burden" on the plaintiffs' First Amendment rights, as LSC's interest in program integrity could be fulfilled by "means less restrictive." *Id.* at 222, 229. On appeal, we held that the district court's application of an undue burden/less-restrictive-means test to the regulations was error, reiterating the standard articulated in *Velazquez I*—that grantees' First Amendment rights may be burdened if they are left with "adequate alternative channels" for protected expression. *Id.* at 229-31. We therefore remanded for the district court to evaluate the program integrity regulations under that standard.

**2.      The Policy Requirement Warrants Heightened Scrutiny**

Applying these cases to the one before us, we conclude that the Policy Requirement, as implemented by the Agencies, falls well beyond what the Supreme Court and this Court have upheld as permissible funding conditions. Unlike the funding conditions in the cases discussed above, the Policy Requirement does not merely restrict recipients from engaging in certain expression (such as lobbying (*Regan*), editorializing (*League of Women Voters*), abortion-related speech (*Rust*), or welfare reform litigation (the LSC cases)), but pushes considerably further and mandates that recipients affirmatively *say* something—that they are "opposed to the practice[] of prostitution," 45 C.F.R. § 89.1. The Policy Requirement is viewpoint-based, and it compels recipients, as a condition of funding, to espouse the government's position.

Compelling speech as a condition of receiving a government benefit cannot be squared with the First Amendment. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714-17 (1977) (finding unconstitutional requirement that drivers, as condition of using the roads, display state motto "Live Free or Die" on license plates); *Speiser v. Randall*, 357 U.S. 513, 518-19 (1958) (finding unconstitutional requirement that veterans, as condition of receiving property tax exemption, declare that they do not advocate the forcible overthrow of government); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 642 (1943) (finding unconstitutional requirement that schoolchildren, as condition of going to school, salute the flag; stating that such "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence").

Here, much as in *Wooley*, *Speiser*, and *Barnette*, silence, or neutrality, is not an option for Plaintiffs. In order to avoid losing Leadership Act funding, they must declare their opposition to

23

prostitution. As Defendants correctly point out, these traditional "compelled speech" cases involved already-existing public benefits, not government funding programs, and are therefore distinguishable in that respect. But these cases teach that where, as here, the government seeks to affirmatively require government-preferred speech, its efforts raise serious First Amendment concerns.[3] The Supreme Court recently implied as much in *FAIR*, where it upheld the Solomon Amendment's requirement that universities permit military recruiters on campus as a condition of receiving federal funding. The Court noted that "[t]here is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse." 547 U.S. at 61-62. The Policy Requirement calls for exactly that.

The Policy Requirement is also viewpoint-based, because it requires recipients to take the government's side on a particular issue. It is well established that viewpoint-based intrusions on free speech offend the First Amendment. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (stating "broad[] principle [that]

---

[3] The dissent devotes considerable energy to the effort of showing that *Wooley*, *Speiser*, and *Barnette* do not control this case. We do not suggest that they do. Indeed, as the dissent acknowledges, we expressly recognize that these compelled speech cases are distinguishable. But we do draw from them the underlying principle that the First Amendment does not look fondly on attempts by the government to affirmatively require speech. In doing so, we do not "put[] . . . aside" the unconstitutional conditions doctrine, Dissent at [28], but rather realize that although *Regan* and its progeny unquestionably provide the framework for our analysis, they do not capture the Policy Requirement as neatly as the dissent suggests. The dissent asserts that "[n]one of those [unconstitutional conditions] cases turned on whether the alleged speech restriction was affirmative or negative," Dissent at [30], but that is easy to say when none of those cases *involved* an affirmative speech restriction. It is partly because the Policy Requirement is just such a restriction that it pushes beyond the restrictions upheld in *Regan*, *Rust*, and the LSC cases, and that we conclude Plaintiffs are likely to succeed in demonstrating that it is an unconstitutional condition.

24

[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment" (internal quotation marks omitted)).

Although viewpoint-based funding conditions that target speech are not necessarily unconstitutional, *see Rust*, 500 U.S. 173, such conditions are constitutionally troublesome. In *Regan*, for example, the Court applied minimal scrutiny in reviewing a condition that was, unlike the Policy Requirement, decidedly viewpoint-*neutral* (it banned *all* lobbying by § 501(c)(3) organizations, regardless of the nature of the legislation or the organization's position on it). *See* 461 U.S. at 541, 548. In *League of Women Voters*, which invalidated a viewpoint-neutral restriction on "editorializing," all four dissenting Justices indicated that if the restriction *were* viewpoint-based, they too would find it constitutionally problematic. *See* 468 U.S. at 407-08 (Rehnquist, J., dissenting) (emphasizing that condition was "strictly neutral," not directed at "editorial views of one particular ideological bent"); *id.* at 413 (Stevens, J., dissenting) ("[O]f greatest significance for me, the statutory restriction is completely neutral in its operation—it prohibits all editorials without any distinction being drawn concerning . . . the point of view that might be expressed."); *cf. Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.").

The LSC cases confirm this conclusion. In *Velazquez I*, we invalidated as viewpoint-discriminatory a restriction prohibiting LSC grantees from representing clients seeking welfare reform. 164 F.3d at 769-72. The Supreme Court affirmed, concluding that *Rust* could not justify the restriction because although, as *Rust* had implicitly established, "viewpoint-based funding decisions can be sustained in instances in which . . . the government use[s] private speakers to

25

transmit information pertaining to its own program," the LSC grantees were not speaking on behalf of the government. *Velazquez II*, 531 U.S. at 540-42 (internal quotation marks omitted). Finally, in *BLS*, while we remanded for the district court to apply the "adequate alternative channels" test to the LSC's viewpoint-neutral program integrity regulations, we expressly recognized, citing *Velazquez I*, that "substantive restrictions that are directed toward speech as such" might require "closer attention"—an issue that "[went] to the . . . statutory restrictions challenged in [the LSC] cases." *See BLS*, 462 F.3d at 230. The Policy Requirement is substantive, viewpoint-based, and "directed toward speech," as it affirmatively requires recipients *to speak*. It is this bold combination in a funding condition of a speech-targeted restriction that is both affirmative and quintessentially viewpoint-based that warrants heightened scrutiny.

Furthermore, the targeted speech, concerning prostitution in the context of the international HIV/AIDS-prevention effort, is a subject of international debate. The right to communicate freely on such matters of public concern lies at the heart of the First Amendment. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." (internal quotation marks omitted)). The Policy Requirement offends that principle, mandating that Plaintiffs affirmatively espouse the government's position on a contested public issue where the differences are both real and substantive. For example, the World Health Organization ("WHO") and the Joint United Nations Programme on HIV/AIDS ("UNAIDS") have recognized advocating for the reduction of penalties for prostitution—to prevent such penalties from

26

interfering with outreach efforts—as among the *best* practices for HIV/AIDS prevention.[4]

Plaintiffs claim that being forced to declare their opposition to prostitution "harms [their] credibility and integrity as NGOs, which generally avoid taking controversial policy positions likely to offend host nations [and] partner organizations," and risks "offending all of the[] groups whose approach to HIV/AIDS may differ from that of the government," not to mention some of the very people, prostitutes, "whose trust they must earn to stop the spread of HIV/AIDS." Appellees' Br. 11-12.

### 3. *Rust* and the Government-Speech Doctrine

In defending the Policy Requirement's viewpoint-based speech mandate, the Agencies turn to *Rust*, which upheld a viewpoint-based prohibition on abortion counseling. Since *Rust*, the Supreme Court has "explained" that decision as having implicitly relied upon a "government speech" principle, stating that: "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government use[s] private speakers to transmit information pertaining to its own program." *Velazquez II*, 531 U.S. at 541 (internal quotation marks and citation omitted). This is because "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833 ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."). Therefore, "[w]hen the government disburses public

---

[4] The dissent declines to comment on the type of speech at issue, and asserts that "the substantive validity" of Plaintiffs' position on prostitution is "not determinative of whether the Policy Requirement is constitutional." Dissent at [47]. But we do not suggest that the *validity* of Plaintiffs' position on the proper approach to prostitution is relevant; rather, it is the fact that the targeted speech concerns a controversial public issue that is constitutionally significant.

27

funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Id.*

According to the Agencies, this case is, like *Rust*, a government-speech case because in enacting the Leadership Act, Congress "sought to advance to the greatest extent possible its message opposing prostitution," "chose to enlist the recipients of Leadership Act funding to disseminate its message," and, "to ensure that the message was conveyed effectively, . . . required that those recipients have [an anti-prostitution] policy." Appellants' Br. 32; *see DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 477 F.3d 758, 761-63 (D.C. Cir. 2007) (upholding Policy Requirement). We are not persuaded.

The Policy Requirement goes well beyond the funding condition upheld in *Rust* because it compels Plaintiffs to voice the government's viewpoint and to do so as if it were their own. Indeed, the *Rust* Court expressly observed that "[n]othing in [the challenged regulations] *requires a doctor to represent as his own any opinion that he does not in fact hold*." 500 U.S. at 200 (emphasis added). Rather, the grantee's staff could remain "silen[t] with regard to abortion," and, if asked about abortion, was "free to make clear that advice regarding abortion is simply beyond the scope of the program." *Id.*[5] Here, on the other hand, Plaintiffs do not have the option of remaining silent or neutral. Instead, they must represent as their own an opinion—that they affirmatively oppose prostitution—that they might not categorically hold. Suffice it to say that *Rust* would have been a very different case had the government gone as far

[5] The *Rust* Court made these observations in the course of addressing the plaintiffs' claim that the regulations violated the First Amendment rights of the grantee's staff, a claim the Court stated was governed by the "same principles" as the claim that the regulations violated the First Amendment rights of the grantee. 500 U.S. at 198.

as requiring Title X recipients to affirmatively adopt a policy statement opposing abortion, in the way the Leadership Act mandates the adoption of a policy statement opposing prostitution. The government has, by compelling NGOs to affirmatively pledge their opposition to prostitution, stepped beyond what might have been appropriate to ensure that its anti-prostitution message would not be "garbled" or "distorted," *Rosenberger*, 515 U.S. at 833.

We do not mean to imply that the government may never require affirmative, viewpoint-specific speech as a condition of participating in a federal program. To use an example supplied by Defendants, if the government were to fund a campaign urging children to "Just Say No" to drugs, we do not doubt that it could require grantees to state that they oppose drug use by children. But in that scenario, the government's program *is*, in effect, its message. That is not so here. The stated purpose of the Leadership Act is to *fight HIV/AIDS*, as well as tuberculosis, and malaria.[6] Defendants cannot now recast the Leadership Act's global HIV/AIDS-prevention program as an anti-prostitution messaging campaign. *Cf. Velazquez II*, 531 U.S. at 547 ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise."). If the government-speech principle allowed Congress to compel funding recipients to affirmatively espouse its viewpoint on every subsidiary issue subsumed within a federal spending program, the exception would swallow the rule.

___

[6] The dissent's counter-hypothetical, involving "potential grantees who do not actually oppose drug use by children, but are tempted by the offer of funds," Dissent at [44], misses the point. Our analysis does not turn on whether individual grantees actually disagree with the government-mandated speech, but rather on the nature of the program. We use the phrase "do so as if it were their own," *supra* at [29], simply to highlight the invasiveness of a condition that requires a recipient to affirmatively represent to the world that it, as an independent, non-governmental entity, holds an opinion—the government's opinion—that it may or may not in fact hold.

29

Defendants assert that advocating against prostitution is indeed "central" to the Leadership Act program, Appellants' Br. 32, but it is difficult to reconcile that assertion with what the Act does. As we have seen, the Policy Requirement expressly exempts three organizations and all U.N. agencies from having to comply with it. 22 U.S.C. § 7631(f) ("[T]his subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency."). As previously noted, the WHO and UNAIDS have taken a public position at odds with the Policy Requirement, recognizing the reduction of penalties for prostitution as a best practice in the fight against HIV/AIDS. Defendants attempt to distinguish these exempted recipients on the ground that they are "public international organizations," such that forcing them to adopt an anti-prostitution policy would require "multilateral negotiations." Appellants' Br. 58. But if anti-prostitution advocacy were central to the government's program, it could, of course, simply choose not to fund these organizations. In short, the Agencies' suggestion that requiring Plaintiffs to adopt an anti-prostitution policy statement is integral to the Leadership Act program is undermined by the fact that the government has chosen to fund high-profile, global organizations that remain free to express—and indeed openly express—a contrary policy, or no policy at all.[7]

Nor are we persuaded by the Agencies' argument that the Policy Requirement is entitled to "leeway" because it implicates "foreign affairs." Appellants' Br. 34-35. While mindful of the

[7] Contrary to the dissent's suggestion, we do not make any "policy judgment" in connection with Congress's decision to exempt these organizations. Dissent at [47]. We simply note that § 7631(f)'s exemption clause undercuts the Agencies' assertion that the adoption of an anti-prostitution policy is central to the Leadership Act program.

government's strong interest in managing international relations, we agree with the district court that this interest, in this case, does not warrant the deference that the Agencies request. *See Alliance I*, 430 F. Supp. 2d at 265-67. The Agencies' reliance on *DKT Memorial Fund Ltd. v. Agency for International Development*, 887 F.2d 275 (D.C. Cir. 1989), is misplaced, as that case centered around a restriction on the First Amendment activities of *foreign* NGOs receiving U.S. government funds. The challenge here is to the impact of the Policy Requirement on *domestic* NGOs. Indeed, the Agencies have applied the Policy Requirement to foreign organizations since its inception, without challenge. This litigation arose only after the government reversed course and began also applying the Requirement to U.S.-based organizations like AOSI and Pathfinder. The Policy Requirement compels domestic NGOs to adopt a policy statement on a particular issue, and prohibits them from engaging in certain expression at, for example, conferences and forums throughout the United States. These factors convince us that the speech is far more of a domestic than a foreign concern.

### 4. The Guidelines

Finally, the Agencies contend that any compelled-speech type problems in the Policy Requirement are successfully addressed by the Guidelines because any entity unwilling to state its opposition to prostitution can form an affiliate that does so. As a consequence, the Agencies assert, the parent organization is not compelled to speak any message at all. But this assertion fails to confront the fact that whether the recipient is a parent or an affiliate, it is required to affirmatively speak the government's viewpoint on prostitution. The "adequate alternative channels for protected expression" test, which is predicated on the rationale that limitations on speech are permissible if grantees can express their opinions elsewhere, does not provide the

31

proper framework for evaluating the Policy Requirement's speech mandate. The curative function of an "adequate alternative channel" is to alleviate the burden of a constraint on speech by providing an *outlet* that allows an organization to engage—through the use of an affiliate—in the privately funded expression that otherwise would have been impermissibly prohibited by the federal program. For example, in *Regan*, a § 501(c)(3) organization's ability to form a § 501(c)(4) affiliate freed it to engage in privately funded lobbying, and, in *League of Women Voters*, the funding restriction would have been saved if the recipient stations had been allowed to form affiliates to engage in privately funded editorializing. It simply does not make sense to conceive of the Guidelines here as somehow addressing the Policy Requirement's affirmative speech requirement by affording an outlet to engage in privately funded *silence*; in other words, by providing an outlet to do nothing at all. It may very well be that the Guidelines afford Plaintiffs an adequate outlet for expressing their opinions on prostitution, but there remains, on top of that, the additional, affirmative requirement that the recipient entity pledge its opposition to prostitution. As the district court aptly stated, "[w]hile the Guidelines may or may not provide an adequate alternate channel for Plaintiffs to express their views regarding prostitution, the clause requiring Plaintiffs to adopt the Government's view regarding . . . prostitution remains intact." *Alliance III*, 570 F. Supp. 2d at 545. The Guidelines, by their very nature, do not account for that requirement.

For the reasons set forth above, we conclude that Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment challenge. Because the Policy Requirement compels grantees to espouse the government's position on a controversial issue, the

district court did not abuse its discretion in preliminarily enjoining its enforcement pending a trial on the merits.[8]

## CONCLUSION

The district court's grant of preliminary injunctive relief is AFFIRMED.

---

[8] Because we affirm on this ground, we, like the district court, do not reach Plaintiffs' argument that the Policy Requirement, as implemented by the Agencies, is unconstitutionally vague with respect to what sorts of speech are prohibited as "inconsistent with [an] opposition to the practice[] of prostitution." 45 C.F.R. § 89.3. Plaintiffs contend that because the Agencies have not promulgated any guidance regarding the kinds of speech and activities that will be deemed insufficiently opposed to prostitution, it is unclear in what prostitution-related expression grantees may, and may not, engage. Plaintiffs point out that the restrictions on speech at issue in the LSC cases, the cases on which the Agencies have attempted to model the instant regime, were substantially more specific than the Policy Requirement is here. Indeed, oral argument left us with the distinct impression that not even Defendants have a grasp on what it means to engage in expression that is "inconsistent" with an opposition to prostitution.

STRAUB, *Circuit Judge*, dissenting:

The majority today holds that the Policy Requirement "falls well beyond what the Supreme Court and this Court have upheld as permissible conditions on the receipt of government funds." Maj. Op. at **[4]**. On the contrary, the Policy Requirement, together with the Guidelines implemented by Defendants, is precisely in line with the "unconstitutional conditions" doctrine as it has been applied in the context of subsidy conditions alleged to violate the First Amendment. The Policy Requirement neither imposes a coercive penalty on protected First Amendment rights nor discriminates in a way aimed at the suppression of any ideas. Furthermore, the viewpoint-based nature of the Policy Requirement is entirely proper because the Leadership Act does not implicate public-forum principles, but rather allows the government to subsidize the transmittal of a message it has concluded is part of its preferred method of fighting HIV/AIDS. Therefore, heightened scrutiny is not proper in this case. Because the Policy Requirement is an entirely rational exercise of Congress's powers pursuant to the Spending Clause and because Plaintiffs have not shown that they are likely to succeed on the merits of their claim that the Policy Requirement is unconstitutional, I would vacate the District Court's grant of a preliminary injunction. Accordingly, I respectfully dissent.

I

A further explanation of the Leadership Act may be helpful in understanding the purpose of the funding restriction at issue here. In 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act, Pub. L. No. 108–25, 117 Stat. 711 (codified as amended at 22 U.S.C. § 7601 *et seq.*). The Act was reauthorized and amended in 2008. *See* 22 U.S.C. § 7671; Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008, Pub. L. No. 110–293, 122 Stat. 2918 (codified at 22 U.S.C. § 7601 *et seq.*). The current version of the Act directs the

-1-

President to "establish a comprehensive, integrated, 5-year strategy to expand and improve efforts to combat global HIV/AIDS," 22 U.S.C. § 7611(a), and provides $48 billion of taxpayer funds to fight the epidemic over five years, *id.* § 7671(a). The Act provides that this strategy shall "make the reduction of HIV/AIDS behavioral risks a priority of all prevention efforts by," among other means, "promoting abstinence from sexual activity and encouraging monogamy and faithfulness," "educating men and boys about the risks of procuring sex commercially and about the need to end violent behavior toward women and girls," "supporting partner country and community efforts to identify and address social, economic, or cultural factors, such as . . . gender-based violence [and] lack of empowerment for women . . . , which directly contribute to the transmission of HIV," "promoting cooperation with law enforcement to prosecute offenders of trafficking, rape, and sexual assault crimes with the goal of eliminating such crimes," and "working to eliminate rape, gender-based violence, sexual assault, and the sexual exploitation of women and children." *Id.* § 7611(a)(12)(A), (F)–(G), (I)–(J). Congress explicitly found that

> [p]rostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices. The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/AIDS epidemic.

*Id.* § 7601(23).

In light of its goal to provide funding for "private sector efforts and expanding public-private sector partnerships to combat HIV/AIDS," *id.* § 7603(4), and its strategy of doing so, in part, by "encouraging monogamy and faithfulness," "educating men and boys about the risks of procuring sex commercially," and "working to eliminate . . . the sexual exploitation of women and children," *id.* § 7611(a)(12)(A), (F), (J), Congress imposed two conditions on Leadership Act funds that are relevant to this case. First, Congress provided that no funds "may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.*

§ 7631(e). Second, Congress provided that

> [n]o funds . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.

*Id.* § 7631(f) ("Policy Requirement"). In this way, Congress ensured not only that no Leadership Act funds would be used to promote prostitution, but also that its "funds go only to organizations that share the Act's disapproval of prostitution and sex trafficking." *DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 477 F.3d 758, 760 (D.C. Cir. 2007).

Defendants the United States Department of Health and Human Services ("HHS") and the United States Agency for International Development ("USAID") ("Agencies") implemented the Policy Requirement by promulgating certain regulations and directives. The current rules require that Leadership Act recipients agree in public announcements of the receipt of funds, and in funding award documents, "that they are opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women, men, and children." HHS Organizational Integrity of Entities Implementing Programs & Activities Under the Leadership Act, 45 C.F.R. § 89.1 (2010); *see also* U.S. Agency for Int'l Dev., AAPD 05–04 Amendment 3, Implementation of the [Leadership Act]—Eligibility Limitation on the Use of Funds & Opposition to Prostitution & Sex Trafficking ¶ 2(A)(1), Attachment A (2010) [hereinafter USAID APPD]. The Agencies also promulgated organizational integrity guidelines and guidance ("Guidelines"), which allow a recipient of Leadership Act funds to maintain an affiliation with an organization that lacks the anti-prostitution policy required by 22 U.S.C. § 7631(f). The Guidelines require the recipient to "have objective integrity and independence" from any affiliate that "engages in activities inconsistent with the recipient's opposition to . . . prostitution." 45 C.F.R. § 89.3; *see also* USAID APPD ¶ 4(B). "Objective integrity and

-3-

independence" will be found if the affiliate receives no transfer of Leadership Act funds from the recipient and the recipient "is, to the extent practicable in the circumstances, separate from the affiliated organization." 45 C.F.R. § 89.3(a)–(b); *see also* USAID APPD ¶ 4(B). "[S]ufficient separation" will be determined "on a case-by-case basis . . . based on the totality of the facts," including by examining five non-exclusive factors. 45 C.F.R. § 89.3(b); *see also* USAID APPD ¶ 4(B). The factors listed are: (1) legal separation of the affiliate, (2) "[t]he existence of separate personnel," (3) "[t]he existence of separate accounting and timekeeping records," (4) "[t]he degree of separation of . . . facilities," and (5) "[t]he extent to which signs and other forms of identification that distinguish the recipient from the affiliated organization are present." 45 C.F.R. § 89.3(b)(1)–(5); *see also* USAID APPD ¶ 4(B).

## II

Plaintiffs' challenges to the Policy Requirement in this case are grounded in two substantive restrictions on government conduct imposed by the First Amendment: the prohibition against compelled speech and the prohibition against viewpoint discrimination. Because the Policy Requirement is not a direct restriction on speech, but rather only a condition on the receipt of a federal subsidy, I analyze Plaintiffs' First Amendment challenges through the prism of the "unconstutional conditions" doctrine as it has been applied in the government subsidy context. As background, I first discuss the underlying First Amendment substantive restrictions at issue and then the development of the "unconstitutional conditions" doctrine in the context of government subsidies.

## A

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. There is no question that "the right of freedom of thought protected by the First Amendment against state action

-4-

includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (discussing constitutional right not to speak). In fact, the Supreme Court has suggested, without holding, that the government may be required to assert an even more compelling interest when it infringes the right to refrain from speaking than is required when it infringes the right to speak. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943) ("It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence."). The Supreme Court has struck down government attempts to directly compel school children to recite the Pledge of Allegiance on pain of expulsion from public school, *see id.* at 629, or to compel drivers to bear a state's motto on their license plates on pain of a monetary fine, *see Wooley*, 430 U.S. at 714–17. The Court also has invalided a state's attempt to indirectly compel speech through the denial of an independent, already-existing tax exemption. *See Speiser v. Randall*, 357 U.S. 513, 518–19 (1958).

The First Amendment also prohibits the government from directly regulating "speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Id.* "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* Viewpoint-based restrictions "raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). "The First Amendment presumptively places this sort of discrimination beyond the power of the government." *Id.*

B

When the government does not directly regulate speech, but only implicates First

-5-

Amendment interests through conditions on federal spending, a different framework applies. The Spending Clause of the United States Constitution provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This provision allows Congress not only to provide federal subsidies to advance its policy goals, but also to "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Congress "has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Id.* (internal quotation marks omitted). For constitutional purposes, a federal subsidy program is fundamentally different from "direct state interference" with a particular activity. *See Maher v. Roe*, 432 U.S. 464, 475 (1977). "Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." *Id.* at 476. As a result, "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998). Subsidy conditions, absent special circumstances, "cannot be subject to the least- or less-restrictive means mode of analysis—which, like the undue burden test . . . , is more appropriate for assessing the government's direct regulation of a fundamental right—when the government creates a federal spending program." *Brooklyn Legal Servs. v. Legal Servs. Corp.*, 462 F.3d 219, 229 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007).

The government's power to impose conditions on federal subsidies is not unlimited. The "unconstitutional conditions" doctrine provides, in the First Amendment context, that "the government may not deny a benefit to a person on a basis that infringes his constitutionally

-6-

protected . . . freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (internal quotation marks omitted) [hereinafter *FAIR*]; *see Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (reaffirming that the government may not terminate an employee based on the exercise of First Amendment rights because "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited"). The "unconstitutional conditions" doctrine does not, however, give rise to a constitutional claim in its own right; the condition must actually cause a violation of a substantive First Amendment right. *See FAIR*, 547 U.S. at 59–60 (declining to address unconstitutional conditions issue because no underlying constitutional violation would arise from direct restriction); *cf.* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1427 (1989) (explaining that "constitutional interest at issue must rise to the level of a recognized right—indeed, a *preferred* right normally protected by strict judicial review"). The purpose of the "unconstitutional conditions" doctrine in the government subsidy context, therefore, is to provide guidance on when a subsidy condition actually "infringes [a person's] . . . constitutionally protected . . . freedom of speech," *FAIR*, 547 U.S. at 59. *See Regan v. Taxation With Representation*, 461 U.S. 540, 548 (1983) (explaining that heightened scrutiny is not required of all conditions on government funding or tax exemptions that merely "'*affect*[] First Amendment rights'" (quoting *Taxation With Representation v. Regan*, 676 F.2d 715, 728 (D.C. Cir. 1982)) (emphasis added in Supreme Court opinion)); *Speiser*, 357 U.S. at 518 (noting that the denial of a tax exemption "may . . . infringe speech").

The "unconstitutional conditions" doctrine was applied in the context of a First Amendment challenge to the denial of a government benefit in *Speiser*. In that case, the State of California attempted to require veterans otherwise eligible for a property tax exemption to sign a

-7-

loyalty oath stating that they did not advocate the violent overthrow of the government. The Supreme Court first observed that "[i]t is settled that speech can be effectively limited by the exercise of the taxing power. To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." *Speiser*, 357 U.S. at 518 (citation omitted). Therefore, the Court concluded that the fact that "a tax exemption is a 'privilege' or 'bounty'" does not mean that "its denial may not infringe speech." *Id.* at 518. The Court explained that in *Speiser*, "the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is 'frankly aimed at the suppression of dangerous ideas.'" *Id.* at 519 (quoting *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 402 (1950)). Having characterized the condition as tantamount to a fine, the Court struck it down pursuant to the Due Process Clause of the Fourteenth Amendment for lacking sufficient procedural protections. *Id.* at 520–29.

In *Taxation With Representation*, the Supreme Court was called on to apply *Speiser* in the context of a condition on nonprofit groups' ability to retain tax-favored status. Specifically, the Court addressed whether Congress's prohibition on lobbying by nonprofit organizations that were allowed to receive tax-deductible contributions amounted to an unconstitutional condition on the organizations' ability to receive tax-deductible money. *See Taxation With Representation*, 461 U.S. at 545. While lobbying is clearly protected by the First Amendment, *see E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–38 (1961), the Court disagreed with the argument that the government had violated nonprofit groups' First Amendment rights by declining to "pay for the lobbying out of public monies," *Taxation With Representation*, 461 U.S. at 545. The Court "reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" *Id.* at 546 (quoting *Cammarano v. United*

-8-

*States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring)). The Court reasoned that the condition was valid because Congress did "not deny [plaintiff Taxation With Representation ("TWR")] the right to receive deductible contributions to support its non-lobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby." *Id.* Congress had not denied TWR the right to receive tax-deductible contributions to support non-lobbying activities because, despite Congress's restriction, the law allowed TWR to use a dual structure whereby TWR could continue to receive tax-deductible contributions to conduct non-lobbying activities while an affiliate organization could conduct any lobbying activities with non-deductible funds. *Id.* at 544. The Supreme Court explained that, therefore, "Congress has not infringed any First Amendment rights or regulated any First Amendment activity[;] Congress has simply chosen not to pay for TWR's lobbying." *Id.* at 546.

The Supreme Court also rejected the claim that Congress had violated TWR's constitutional rights by continuing to allow tax-exempt veterans' organizations to lobby with tax-deductible contributions. *Id.* at 546–47. Congress was free to "select[] . . . particular entities or persons for entitlement to this sort of largesse [because the decision wa]s obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find." *Id.* at 549 (internal quotation marks omitted). The Court cautioned, however, that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way 'to aim at the suppression of dangerous ideas.'" *Id.* at 548 (some internal quotation marks omitted) (quoting *Cammarano*, 358 U.S. at 513, in turn quoting *Speiser*, 357 U.S. at 519). The Court found "no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect." *Id.* It also explicitly rejected the holding of the Court of Appeals below that "'strict scrutiny' is required because the statute '*affect[s]* First Amendment rights on a discriminatory basis.'" *Taxation With Representation*, 461 U.S. at 548 (quoting

*Taxation With Representation v. Regan*, 676 F.2d 715, 728 (D.C. Cir. 1982)) (alteration and emphasis added in Supreme Court opinion). The Supreme Court explained that it "is not the law" that "strict scrutiny applies whenever Congress subsidizes some speech, but not all speech." *Id.* Rather, "appropriations are comparable to tax exemptions and deductions, which are also a matter of grace [that] Congress can, of course, disallow . . . as it chooses." *Id.* at 549 (internal quotation marks omitted). The Court emphasized again that "[w]here governmental provision of subsidies is not 'aimed at the suppression of dangerous ideas,' its 'power to encourage actions deemed to be in the public interest is necessarily far broader.'" *Id.* at 550 (quoting *Cammarano*, 358 U.S. at 513, and *Maher*, 432 U.S. at 476, respectively).

In a concurrence, Justice Blackmun, joined by Justices Brennan and Marshall, pointed out that Congress had in reality "not merely den[ied] a subsidy for lobbying activities" as the Court had suggested, it had prohibited an organization from receiving "tax-deductible contributions for all its activities, whenever one of those activities is 'substantial lobbying.'" *Id.* at 552 (Blackmun, J., concurring). Justice Blackmun therefore urged that this restriction would in fact "den[y] a significant benefit to organizations choosing to exercise their constitutional rights" and, as a result, would be an unconstutional condition. *Id.* at 552 & n.*. As support for this conclusion, Justice Blackmun cited, among other opinions, Justice Douglas's concurrence in *Cammarano*, which noted that while Congress's denial of a business-expense deduction for lobbying activities was constitutional, the denial of all business deductions for a taxpayer who lobbied, "would be placing a penalty on the exercise of First Amendment rights," *Cammarano*, 358 U.S. at 515 (Douglas, J., concurring) (cited in *Taxation With Representation*, 461 U.S. at 552 n.* (Blackmun, J., concurring)). Justice Blackmun's *Taxation With Representation* concurrence went on to explain that the lobbying restriction in that case was saved by the fact that a nonprofit organization could create an affiliate to "make known its views on legislation . . . without losing

-10-

tax benefits for its nonlobbying activities." *Taxation With Representation*, 461 U.S. at 553.

Because of this dual structure, Justice Blackmun explained that "the Court finds that Congress' purpose in imposing the lobbying restriction was merely to ensure that 'no tax-deductible contributions are used to pay for substantial lobbying.'" *Id.* at 553.

*Taxation With Representation* therefore expanded in two ways on *Speiser*'s initial discussion of the "unconstitutional conditions" doctrine as it applies to conditions on government benefits or subsidies that affect First Amendment rights. First, the Court noted that a funding condition would be unconstitutional if it operated as a coercive penalty on the exercise of First Amendment rights. The Court suggested two ways that a government condition could do this: (1) if it restricted a recipient's First Amendment speech outside of the scope of the recipient's participation in the government program (for example, by restricting TWR from lobbying even with non-deductible contributions), or (2) if it denied government benefits to which the recipient would otherwise be entitled and that are independent from those provided by the government program at issue (for example, by denying a property tax exemption for failure to take a loyalty oath). *See id.* at 545. Second, *Taxation With Representation* cautioned that when the purpose of a condition is not to define the boundaries of federal spending, but rather to suppress certain viewpoints, the condition may be unconstitutional. *See id.* at 548. It is either as a coercive penalty or as viewpoint suppression, then, that the denial of a government benefit may "infringe[ a person's] constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit," *FAIR*, 547 U.S. at 59 (internal quotation marks omitted).

In the following two sections, I first address cases analyzing funding conditions as penalties on speech and then turn to cases discussing funding conditions alleged to impermissibly discriminate on the basis of viewpoint.

The term following its *Taxation With Representation* decision, the Supreme Court decided *FCC v. League of Women Voters*, 468 U.S. 364 (1984), which underlined the importance of the affiliate structure available in *Taxation With Representation*. In *League of Women Voters*, the Supreme Court ruled that Congress's prohibition on editorializing by any noncommercial broadcast station that received a federal grant was not "sufficiently limited . . . to justify the substantial abridgment of important journalistic freedoms which the First Amendment jealously protects." *Id.* at 402. By denying federal grants to stations that editorialized, Congress had not merely refused to subsidize editorializing by public broadcasting stations, but rather it had caused a "station that receives only 1% of its overall income from [federal] grants [to be] barred absolutely from all editorializing." *Id.* at 400. "The station ha[d] no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it [wa]s barred from using even wholly private funds to finance its editorial activity." *Id.* The Court explicitly noted, however, that if Congress maintained the restriction but allowed broadcast stations to establish affiliate organizations to editorialize with nonfederal money, "such a statutory mechanism would plainly be valid under the reasoning of *Taxation With Representation*." *Id.* The Court in *League of Women Voters*, therefore, as both the *Taxation With Representation* Court, 461 U.S. at 544–46, and Justice Blackmun concurring in that case, *id.* at 552–53, had suggested, concluded that a federal funding condition that not only limited the scope of the government program, but that also denied a recipient the right to spend private money in support of protected First Amendment activities, went too far.

In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court applied the "unconstitutional conditions" doctrine in the context of a subsidy program that appropriated grants to healthcare organizations to operate family planning projects. Congress conditioned the grants with the

restriction that none of the federal funds were to be "'used in programs where abortion is a method of family planning,'" *id.* at 178 (quoting 42 U.S.C. § 300a–6). The Supreme Court upheld agency regulations preventing federally funded projects from providing abortion counseling or "engaging in activities that 'encourage, promote or advocate abortion as a method of family planning.'" *Id.* at 180 (quoting 42 C.F.R. § 59.10(a) (1989)). The Court ruled that the regulations did "not force the . . . grantee to give up abortion-related speech; they merely require[d] that the grantee keep such activities separate and distinct from [government-funded] activities." *Id.* at 196. When the government simply "insist[s] that public funds be spent for the purposes for which they were authorized," "the [g]overnment is not denying a benefit to anyone" and there is no unconstitutional penalty on free speech. *Id.* The Court noted that the regulations in *Rust* continued to allow healthcare organizations to advocate for abortion; they "simply [were] required to conduct those activities through programs that [were] separate and independent from the project that receives [federal] funds." *Id.* In this way, the regulations in *Rust* were like those in *Taxation With Representation* that allowed for protected lobbying to continue with non-deductible contributions, and unlike those in *League of Women Voters* that prohibited stations from editorializing even with private funds. *See id.* at 197–98. The *Rust* Court explained that

> [b]y requiring that the [federal program] grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and [*Taxation With Representation*], not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the [federally funded] project in order to ensure the integrity of the federally funded program.

*Id.* at 198; *see also Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 766 (2d Cir. 1999) [hereinafter *Velazquez I*] (explaining that the restriction in *Rust* "was limited to speech at odds with the values Congress was seeking to advance through its grant program"), *aff'd*, 531 U.S. 533 (2001).

-13-

Finally, in *United States v. American Library Ass'n*, 539 U.S. 194 (2003), the Supreme Court upheld a law that denied public libraries funding to provide Internet access unless the libraries installed software to block access to obscenity and child pornography and to prevent children from accessing inappropriate material.[1]  The plurality opinion rejected the argument that the law imposed an unconstitutional condition on the receipt of federal funding because it "penaliz[ed] a library for failing to install filtering software on every one of its Internet-accessible computers." *Id.* at 212 (quoting *id.* at 226 (Stevens, J., dissenting)).  The plurality explained that the law

> does not "penalize" libraries that choose not to install such software, or deny them the right to provide their patrons with unfiltered Internet access.  Rather, [the law] simply reflects Congress' decision not to subsidize their doing so.  To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance.  A refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity.

*Id.* (some internal quotation marks omitted).  The plurality also expressly distinguished cases that "involved true penalties, such as denial of a promotion or outright discharge from employment," from "nonsubsidies," like the one at issue in *American Library Ass'n*.  *Id.* at 212 n.6.

In this way, *American Library Ass'n* was precisely in line with *Speiser*, *Taxation With Representation*, *League of Women Voters*, and *Rust*.  When acting pursuant to its Spending Clause powers, Congress may attach conditions to federal subsidies that have the effect of limiting recipients' First Amendment rights, as long as the conditions do not limit free speech outside of the scope of the government program and do not deny independent benefits to which recipients are otherwise entitled in an attempt to penalize First Amendment activity.  Even when

---

[1] The judgment of the Court was announced in an opinion by Chief Justice Rehnquist and joined by three other Justices.  Two other Justices concurred in the judgment and each filed their own opinions.

funding conditions limit or affect speech, such limits are generally permissible if they are meant only to ensure that government funds are used for the purposes for which they were authorized. This is because, absent special circumstances, there is no coercive force behind a funding condition that is truly cabined to the federal subsidy program to which it is attached. If potential recipients do not wish to abide by the condition, they can simply choose not to accept the funds. *See Am. Library Ass'n*, 539 U.S. at 212 ("To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance."); *Rust*, 500 U.S. at 199 ("[T]his limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority."); *id.* at 199 n.5 ("[S]ubsidies are just that, subsidies. The recipient is in no way compelled to operate a [federally funded] project; it can simply decline the subsidy."); *Grove City College v. Bell*, 465 U.S. 555, 575 (1984) ("Grove City may terminate its participation in the [federal] program and thus avoid the requirements of [the condition]."); *cf. Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 130 S. Ct. 2971, 2986 (2010) ("[Plaintiff] in seeking what is effectively a state subsidy, faces only indirect pressure to modify its membership policies."); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 586 (1983) (plurality opinion) ("[T]he receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt."); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 27 (1981) (explaining that "legislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the [recipient] States agree to comply with federally imposed conditions" and concluding that "the court below failed to recognize the well-settled distinction between congressional 'encouragement' of state programs and the imposition of binding obligations on the States"). This is why it is usually the case that

-15-

"Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Velazquez I*, 164 F.3d at 766; *accord Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 231 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007). When adequate alternative channels are available, any restrictions on protected First Amendment activity imposed within the scope of the federal program only apply to that federally funded program and therefore are not the equivalent of direct restrictions or "true penalties," *Am. Library Ass'n*, 539 U.S. at 212 n.6. *See Brooklyn Legal Servs.*, 462 F.3d at 231; *Velazquez I*, 164 F.3d at 766.

2

*Speiser* and *Taxation With Representation* also emphasize that funding conditions may be unconstitutional if they "discriminate invidiously . . . in such a way as to 'aim at the suppression of dangerous ideas,'" *Regan v. Taxation With Representation*, 461 U.S. 540, 550 (1983) (quoting *Cammarano*, 358 U.S. at 513). The Supreme Court and this Court have addressed claims that funding conditions impermissibly discriminate on the basis of viewpoint in *Rust*, *Rosenberger*, *Finley*, the *Velazquez* cases, and *American Library Ass'n*.

In *Rust*, recipients of the family planning grants argued that the regulations restricting federal funds from being used for abortion services constituted impermissible viewpoint discrimination in favor of an anti-abortion position. 500 U.S. at 192. Relying on *Taxation With Representation*, they argued that because the government "continue[d] to fund speech ancillary to pregnancy testing in a manner that is not evenhanded with respect to views and information about abortion, it invidiously discriminates on the basis of viewpoint." *Id.* (internal quotation marks omitted). The Supreme Court rejected this challenge and found that Congress had not discriminated in favor of an anti-abortion position, but had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193. The Court reiterated that "'[t]here is a basic difference

-16-

between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.'" *Id.* (quoting *Maher v. Roe*, 432 U.S. 464, 475 (1977)). In other words, *Rust* was "not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope," *id.* at 194. This was so even though it cannot be denied that the scope of the government-funded project in *Rust* necessarily limited recipients' ability to advocate a pro-abortion viewpoint within the scope of the government program.[2]

The Court applied *Rust* in the context of the provision of public-university funds to student groups in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). In that case, the University of Virginia denied funding from its Student Activities Fund to a student organization that wished to publish a newspaper that advocated Christian viewpoints. The Supreme Court analogized the Student Activities Fund to creating a "metaphysical" limited public forum for student speech. *Id.* at 829–30. The Court explained that once the State "has opened a limited forum, . . . the State must respect the lawful boundaries

---

[2] While the *Rust* Court explained that "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other," 500 U.S. at 193, that may have been another way of stating the conclusion that the government had not *impermissibly* discriminated on the basis of viewpoint. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) [hereinafter *Velazquez II*] ("The Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under [the federal program] amounted to governmental speech; when interpreting the holding in later cases, however, we have explained *Rust* on this understanding."); *Velazquez I*, 164 F.3d at 770 ("[W]e doubt that these words [in *Rust*] can reliably be taken at face value."). The regulations at issue in *Rust* did, in fact, prohibit a particular position on abortion. *See Velazquez II*, 531 U.S. at 541 ("We have said that viewpoint-based funding decisions can be sustained in instances . . . like *Rust*, in which the government 'used private speakers to transmit specific information pertaining to its own program.'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995))); *Rust*, 500 U.S. at 209 (Blackmun, J., dissenting) ("The regulations are also clearly viewpoint based."); *id.* at 210 (quoting the agency regulation stating that a project "may not *encourage, promote or advocate* abortion" (emphasis added in *Rust*)); *see also* Robert C. Post, *Subsidized Speech*, 106 Yale L.J. 151, 170 (1996) ("The [*Rust*] regulations plainly discriminate on the basis of viewpoint . . . .").

it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Id.* at 829 (internal citations and quotation marks omitted). The Supreme Court rejected the University's attempt to rely on *Rust* for the proposition that it could make content-based funding decisions when necessary to accomplish its educational mission. *Id.* at 832–33. In so doing, the Court acknowledged that it was true that "we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Id.* at 833. The Court pointed to *Rust* as a case where

> the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.

*Id.* (internal citations omitted). The Court explained, however, that it had never held that "viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834. In sum, because the University offered funds to student groups specifically to "encourage a diversity of views from private speakers" and intended to facilitate the speech of private "speakers who convey their own messages," the University could not, having created a quasi-limited public forum for student speech, then "silence the expression of selected viewpoints." *Id.* at 834–35.

The Court had an opportunity to further explain *Rosenberger* in *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998). In that case, Congress directed the National Endowment for the Arts ("NEA") to consider "general standards of decency and respect for the diverse beliefs and values of the American public" in determining whether to award federal grants to

artists. *Id.* at 572. Performance artists who were denied funding claimed that the funding condition constituted viewpoint discrimination against art that offended standards of decency or did not respect mainstream values. *Id.* at 580. The Supreme Court rejected this challenge and concluded that Congress's restriction would not "give rise to the suppression of protected expression." *Id.* at 585. In so doing, the Supreme Court distinguished the nature of the program at issue in *Finley* with that in *Rosenberger*. The Supreme Court explained that in *Rosenberger*, the government "indiscriminately 'encourage[d] a diversity of views from private speakers.'" *Id.* at 586 (quoting *Rosenberger*, 515 U.S. at 834). In *Finley*, on the other hand, the NEA was mandated to "make esthetic judgments" that were "inherently content-based." *Id.* The purpose of the program, therefore, set the NEA subsidy "apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations . . . and from comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater, or the second class mailing privileges available to all newspapers and other periodical publications" at issue in other cases where viewpoint discrimination was found impermissible. *Id.* (internal citations and quotation marks omitted). The Supreme Court reiterated its warning that, nevertheless, the government may not "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints," and may not aim at the suppression of dangerous ideas. *Id.* at 587. Having found no evidence of such suppression, however, the logic of *Rust v. Sullivan*, 500 U.S. 173 (1991), applied: The government was free to "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587–88 (relying in part on *Rust*, 500 U.S. at 193); *accord Brooklyn Legal Servs.*, 462 F.3d at 230 ("[T]he government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech at stake.").

Our Court was called on to apply these cases in *Velazquez I*, 164 F.3d 757 (2d Cir. 1999). In that case, lawyers employed by grantees of the Legal Services Corporation ("LSC")[3] challenged a law that barred LSC funds from being used to perform various activities, including lobbying, participating in class actions, seeking attorneys' fees, or seeking to reform or challenge existing welfare laws. We first analyzed *Taxation With Representation*, *FCC v. League of Women Voters*, 468 U.S. 364 (1984), and *Rust* and summarized those cases as providing that "in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Velazquez I*, 164 F.3d at 766. We upheld all of the restrictions at issue from a facial challenge that they burdened the recipients' ability to use private funds to engage in First Amendment protected activity. *Id.* at 765–67. We relied on the teaching of *Taxation With Representation* and *League of Women Voters* (and the fact that "*Rust* is consistent with these cases") that subsidy restrictions are acceptable if there are "adequate alternative avenues for expression through affiliates." *Id.* at 766–67. We left for a future case, ultimately *Brooklyn Legal Services*, 462 F.3d at 219, 222–23, the question whether the alternatives provided under the LSC program were in fact adequate in the context of an as-applied challenge. *See infra* at **[37]**.

In *Velazquez I*, we also upheld almost all of the restrictions against a viewpoint discrimination challenge because we found that they were in fact viewpoint neutral. 164 F.3d at 767–69. However, we concluded that the limitation that precluded a lawyer who received LSC funds from challenging an existing welfare rule in a suit on behalf of a client for welfare benefits

---

[3]The LSC is "a non-profit government-funded corporation, created by [an Act of Congress], for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." *Id.* at 759 (internal citation and quotation marks omitted).

was not viewpoint neutral. We noted that the restriction "clearly seeks to discourage challenges to the status quo." *Id.* at 770. The majority declined to follow then-Judge Jacobs's view, concurring in part and dissenting in part, that whether viewpoint discrimination was permissible in the context of the proviso at issue turned on whether the government, through funding the LSC, sought to promote a diversity of private views as it had done in *Rosenberger. See id.* at 775–77 (Jacobs, J., concurring in part, dissenting in part) (arguing additionally that the proviso was viewpoint neutral). Judge Jacobs concluded that the LSC program was not created to fund a diversity of private views and that when the government does not "create[] a limited public forum for the expression of diverse viewpoints," *id.* at 774, "the principle[ ]explicitly announced in *Rust* and not implicated by the facts of *Rosenberger*" applies: "[W]hen the government funds specific services it deems to be in the public interest, it may require grantees to get with its program," *id.* at 776. The majority, on the other hand, reasoned that *Rust*'s conclusion that the government in that case had "not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other," *Rust*, 500 U.S. at 193, could not "reliably be taken at face value," *Velazquez I*, 164 F.3d at 770. Instead of adopting Judge Jacobs's framework, the majority focused on the type of speech at issue, noting that criticism of government policy garners the strongest First Amendment protection. *Id.* at 771. Because the majority found that a lawyer's argument that a welfare statute is invalid was closer to criticism of official policy than to the type of speech at issue in cases where the Supreme Court had rejected viewpoint discrimination challenges (abortion counseling in *Rust* and indecent art in *Finley*), it held that the restriction on challenging welfare laws was subject to strict First Amendment scrutiny. *Id.* at 771–72.

Granting certiorari in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) [hereinafter *Velazquez II*], the Supreme Court appeared generally to endorse Judge Jacobs's

-21-

framework for comparing the LSC restrictions with the restrictions at issue in *Rust* and *Rosenberger*, although it disagreed with Judge Jacobs's conclusion that the LSC program was more like the former than the latter. The Supreme Court explained that while the *Rust* Court "did not place explicit reliance on the rationale that counseling services of the doctors under Title X amounted to governmental speech . . . we have explained *Rust* on this understanding." *Velazquez II*, 531 U.S. at 541. The Court therefore noted that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government 'used private speakers to transmit specific information pertaining to its own program.'" *Velazquez II*, 531 U.S. at 542 (internal citation omitted) (quoting *Rosenberger*, 515 U.S. at 833). The Court contrasted those cases with a situation in which the government "'does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.'" *Id.* at 542 (quoting *Rosenberger*, 515 U.S. at 834). In the latter case, "'it does not follow . . . that viewpoint-based restrictions are proper.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 834) (omission in *Velazquez II*). The Court acknowledged that the LSC program was different from the Student Activities Fund at issue in *Rosenberger* because the LSC program did not seek to "encourage a diversity of views," but concluded that "the salient point is that, like the program in *Rosenberger*, the LSC program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542. The private nature of the speech facilitated was underlined by the fact that the government sought "to use an existing medium of expression"—the lawyer-client relationship—"and to control it, in a class of cases, in ways which distort its usual functioning." *Id.* at 543.

The *Velazquez II* Court also rejected the government's argument that the restriction on suits challenging welfare laws was "necessary to define the scope and contours of the federal

program" and "help[] the current welfare system function in a more efficient and fair manner by removing from the program complex challenges to existing welfare laws." *Id.* at 547. The Court ruled that "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* The Court explained that "in the context of this statute, there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives." *Id.* at 548. In ultimately holding the restriction invalid, the Court emphasized that "[w]here private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id.* at 548–49 (citing *Regan v. Taxation With Representation*, 461 U.S. 540, 548 (1983), and *Speiser v. Randall*, 357 U.S. 513, 519 (1958)).

Finally, in *United States v. American Library Ass'n*, 539 U.S. 194 (2003), a plurality of the Court explicitly rejected the argument that *Velazquez II* limited *Rust* to cases "'in which the government seeks to communicate a specific message.'" *Id.* at 213 n.7 (quoting *id.* at 228 (Stevens, J., dissenting)). Dissenting, Justice Stevens relied on *Velazquez II* to argue that the condition requiring public libraries to install filtering software was an attempt to "distort[] th[e] medium" of "Internet-accessible computers." *Id.* at 227–28. Justice Stevens rejected the *American Library Ass'n* plurality's assertion that *Rust* allowed Congress to restrict the scope of its own subsidy programs by arguing that "*Rust* only involved, and only applies to, instances of governmental speech—that is, situations in which the government seeks to communicate a specific message." *Id.* at 228. The plurality, however, explained that "*Velazquez* held only that viewpoint-based restrictions are improper 'when the [government] does not itself speak or subsidize transmittal of a message it favors *but instead expends funds to encourage a diversity of views from private speakers*,'" *id.* at 213 n.7 (quoting *Velazquez II*, 531 U.S. at 542) (emphasis

-23-

added in *American Library Ass'n*).  The plurality reasoned that *Velazquez II* did not apply in *American Library Ass'n* because "public libraries do not install Internet terminals to provide a forum for Web publishers to express themselves, but rather to provide patrons with online material of requisite and appropriate quality."  *Id.*

III

In this case, the majority concludes that the Policy Requirement "warrants heightened scrutiny" because it is a "bold combination in a funding condition of a speech-targeted restriction that is both affirmative and quintessentially viewpoint-based."  Maj. Op. at **[27]**.  However, the Policy Requirement is a permissible funding condition under the "unconstitutional conditions" doctrine as it has been applied in the government subsidy context because it neither imposes a penalty on protected First Amendment rights nor discriminates in a way aimed at the suppression of ideas.  Furthermore, the viewpoint-based nature of the Policy Requirement is entirely proper because no public forum principles are implicated in this case.

A

Although it is obvious, it must be noted at the outset that the Policy Requirement does not actually compel anyone to speak the government's favored viewpoint.  The Policy Requirement is a condition on the voluntary receipt of Leadership Act funds—funds which are available only to groups that wish to participate in the government's "global strateg[y] to combat HIV/AIDS," 22 U.S.C. § 7603(1).  The Supreme Court has explained that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."  *Maher v. Roe*, 432 U.S. 464, 475 (1977); *see also Taxation With Representation*, 461 U.S. at 550 ("Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution does not confer an entitlement to such funds as may be necessary to realize

-24-

all the advantages of that freedom." (internal quotation marks omitted)); *id.* at 549 ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."); *id.* (noting that government appropriations, like tax deductions, are "a matter of grace [that] Congress can, of course, disallow . . . as it chooses" (internal quotation marks omitted)). "In diverse contexts, [the Supreme Court's] decisions have distinguished between policies that require action and those that withhold benefits." *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2986 (2010); *see also Am. Library Ass'n*, 539 U.S. at 212 n.6 (distinguishing "true penalties" from "nonsubsidies"); *ACORN v. United States*, 618 F.3d 125, 137 (2d Cir. 2010) (noting that for purposes of determining whether a law constitutes punishment in violation of the Bill of Attainder Clause "the plaintiffs are not prohibited from any activities; they are only prohibited from receiving federal funds to continue their activities"), *cert. denied*, ___ S. Ct. ___, 2011 WL 704331 (June 20, 2011). In seeking to partner with organizations that oppose prostitution, Congress "is dangling the carrot of subsidy, not wielding the stick of prohibition." *Christian Legal Soc'y*, 130 S. Ct. at 2986. Plaintiffs' speech is not compelled because if Plaintiffs do not wish to ascribe to the Policy Requirement, they may simply chose not to seek Leadership Act funds. The Supreme Court has repeatedly concluded that a subsidy, temptation, or motive provided by the government is not, except in special circumstances, coercive and may simply be declined by any potential recipient. *See* cases cited *supra* at **[16–17.]** "[S]ilence, or neutrality" is, in fact, "an option for Plaintiffs." *See* Maj. Op. at **[25]**.

Of course, *Speiser* and its progeny teach that, in some instances, the denial of a government benefit can have the same "deterrent effect" on free speech as the direct regulation of speech. *See Speiser*, 357 U.S. at 518. The "unconstitutional conditions" doctrine provides the

framework for analyzing when the denial of a government benefit rises to the level of an infringement on free speech. Despite engaging in a thorough discussion of "unconstitutional conditions" cases in the government subsidy context, the majority puts that doctrine aside and appears to conclude that when a funding condition imposes an affirmative rather than negative speech requirement, it always "raise[s] serious First Amendment concerns," Maj. Op. at **[25]**. As support for this proposition, the majority offers two pieces of evidence. First, the majority observes that *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), *Speiser*, and *Wooley v. Maynard*, 430 U.S. 705 (1977), were compelled speech cases where heightened scrutiny was applied or where the restrictions at issue were otherwise struck down. Second, the majority points to one sentence in *FAIR,* 547 U.S. 47 (2006), that it believes suggests that affirmative-speech funding conditions "push[] beyond," Maj. Op. at **[25 n.3]**, what the First Amendment allows.

First, as the majority recognizes, *Barnette*, *Speiser*, and *Wooley* are not cases where the government sought to appropriate public funds and then limit the scope of the subsidy program. *Wooley* and *Barnette* have traditionally been described as cases of the government's attempt to compel speech through the direct force of law. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (describing *Barnette* as a case of "outright compulsion of speech"). While those cases can be creatively recast, as the majority does, to be, along with *Speiser*, cases about conditions placed on the governmental benefits of "going to school" (*Barnette*) and "using the roads" (*Wooley*), the government's attempt to deny the benefits in those cases was quite different from the Policy Requirement at issue here. In *Barnette* and *Wooley*, the only alternatives to accepting the government's benefits would be not to go to public school or not drive on the public roads, respectively. The government, therefore, used its monopoly power over public education and the public roads to put recipients to a choice that was obviously coercive—there

-26-

was no realistic alterative to accepting the conditions and giving up First Amendment rights. *See Frost v. R.R. Comm'n*, 271 U.S. 583, 593 (1926) (explaining that the choice of whether to use the public highways or submit to a burden on constitutional rights gave the plaintiff "no choice, except a choice between the rock and the whirlpool"). In this case, Plaintiffs do not argue that Leadership Act funds are vital to their continued survival or even that they are the only source of funds to fight HIV/AIDS. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 596–97 (1998) (Scalia, J., concurring in the judgment) (viewing skeptically the potential argument that the denial of an entirely voluntary subsidy may constitute coercion equivalent to a direct compulsion to speak if it were the only source of a recipient's funding). Moreover, in *Barnette*, *Speiser*, and *Wooley*, the threatened denial of a so-called government benefit turned on requiring the recipient to speak a message that was unrelated to the government benefit at issue. The government in those cases threatened the denial of an existing benefit (going to school, a property tax exemption, and using the roads, respectively) as a means of coercing recipients to give up First Amendment rights. The restrictions in *Barnette*, *Speiser*, and *Wooley* were not merely attempts to confine government spending to the scope of a subsidy program, of course, because there was no relevant subsidy program at all in those cases. *Cf. Taxation With Representation*, 461 U.S. at 545 ("But TWR is just as certainly incorrect when it claims that this case fits the *Speiser-Perry* model."). Therefore, the actual purposes of the government regulations were revealed and they were properly found invalid.

It is difficult to understand what relevance these cases can have to determining whether a true government subsidy condition is constitutional. *Speiser*, and particularly *Barnett* and *Wooley*, only provide the underlying substantive basis for Plaintiffs' compelled speech claims in this case, just as in *Taxation With Representation*, for example, the underlying substantive doctrine provided that Congress would violate the First Amendment if it directly restricted the

-27-

right to lobby, *see id.*, 461 U.S. at 552 (Blackmun, J., concurring) (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–38 (1961), for the proposition that lobbying is a protected activity).  The existence of an underlying substantive First Amendment prohibition, however, did not resolve the constitutionality of the condition at issue in *Taxation With Representation*; nor does it here.  Rather, this case calls on us to determine whether, despite Congress's broad power to impose conditions on federal spending, a funding condition that imposes an affirmative speech requirement is so coercive as to equal a direct compulsion of speech.  The majority need not struggle from a blank slate with determining the proper way to approach this question.  The Supreme Court has already provided the framework for us in *Taxation with Representation*, *Rust*, and the entire line of cases applying the "unconstitutional conditions" doctrine in the government subsidies context.

None of those cases turned on whether the alleged speech restriction was affirmative or negative.[4]  Rather, the foundational principle of *Taxation With Representation* and *Rust* is that the government is allowed to "insist[] that public funds be spent for the purposes for which they were authorized," *Rust v. Sullivan*, 500 U.S. 173, 196 (1991).  The Policy Requirement in this case does precisely that.  Congress determined that as part of fighting "the spread of the HIV/AIDS epidemic," "it should be the policy of the United States to eradicate" "[p]rostitution." 22 U.S.C. § 7601(23).  It also determined that it desired to fight HIV/AIDS specifically through a strategy of "reduc[ing] HIV/AIDS behavioral risks" and "eliminat[ing] . . . the sexual

---

[4] The majority is certainly correct to note that none of the unconstitutional conditions cases even involved an affirmative speech condition.  Maj. Op. at **[25 n.3]**.  It is the intersection of those two doctrines that provides the novel constitutional question before us.  The point remains, however, that there has never been a suggestion that the mere existence of a particular type of substantive First Amendment concern should control whether a government funding condition is unconstitutional.  That is because "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."  *Maher v. Roe*, 432 U.S. 464, 475 (1977).

-28-

exploitation of women and children." *Id.* § 7611(a)(12), (a)(12)(J). It therefore only authorized federal funds for organizations that shared its desire to affirmatively reduce HIV/AIDS behavioral risks, including its policy of eradicating prostitution. As a means to this end, the Agencies require recipients to affirm in funding award documents that they are in fact opposed to prostitution. The Policy Requirement is therefore precisely aimed at Congress's goal. Congress did not determine in the Leadership Act that it wished to fight HIV/AIDS through a strategy of remaining neutral on the issue of prostitution and other behavioral risks that contribute to the HIV/AIDS epidemic and that it would implement that strategy by simply withholding funding from groups that support prostitution, *cf. id.* § 7631(e). Rather, it specifically wanted to "eradicate" prostitution and other behavioral risks. *Id.* § 7601(23). While in *Rust*, Congress wished to *not* fund abortion activities through its family planning grants, here Congress sought to eradicate prostitution and decided to affirmatively fund only groups that shared its particular approach to fighting HIV/AIDS. It is perfectly within Congress's Spending Clause powers to craft a condition that "insist[s] that public funds be spent for the purposes for which they were authorized," *Rust*, 500 U.S. at 196.

The second reason the majority concludes that affirmative speech requirements always "raise serious First Amendment concerns," Maj. Op. at **[25]**, is *FAIR*'s statement that "[t]here is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse," *FAIR*, 547 U.S. at 61. In *FAIR*, various law schools challenged Congress's decision to withhold federal grants from educational institutions that denied military recruiters access equal to that of other recruiters. *Id.* at 51. The Supreme Court did not engage in an "unconstitutional conditions" analysis because it concluded that "the First Amendment would not prevent Congress from directly imposing the . . . access requirement" on universities in any event. *See id.* at 59–60 (declining to "determine when a condition placed on university funding goes beyond

-29-

the reasonable choice offered in *Grove City* and becomes an unconstitutional condition" (internal quotation marks omitted)). In that context, the Supreme Court addressed the law schools' argument that the access requirement constituted compelled speech because the schools were forced, if they sent e-mails and posted notices regarding other campus recruiters, to do the same for military recruiters. *Id.* at 61–62. The Supreme Court set out the compelled-speech doctrine pursuant to *Barnette* and *Wooley* and concluded that "recruiting assistance . . . is a far cry from the compelled speech in *Barnette* in *Wooley*." *Id.* at 62. The Court explained that Congress's restriction "does not dictate the content of the speech at all . . . . There is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse." *Id.* The Court therefore found that a necessary but not sufficient element of an unconstitutional funding condition was absent—there would be no underlying First Amendment violation if the condition was applied directly. The Court had no need to address whether a funding condition that required recipients to espouse a particular message would be constitutional under the First Amendment and said nothing about that issue. *FAIR*, therefore, has little relevance to the key issue in this case for the same reason that *Barnette*, *Speiser*, and *Wooley* are not determinative: There is a basic difference between the denial of government funding and a direct compulsion to speak.

B

Because there is a doctrine that precisely addresses whether a government subsidy condition is constitutional pursuant to the First Amendment, I would apply it here. The Policy Requirement imposes neither of the two types of burdens identified in *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), as penalizing free speech such that a subsidy condition approaches the coercive effects of a direct restriction. First, the Policy Requirement does not deny any independent government benefit to which Plaintiffs are otherwise entitled. The only

-30-

consequence if Plaintiffs do not subscribe to the Leadership Act's Policy Requirement is that they will not receive Leadership Act funds. This is unlike *Speiser* (and *Barnette* and *Wooley* if re-characterized as government-funding cases) where the denial of independent, already-existing benefits was threatened. It is also unlike the denial of all business deductions for a taxpayer who lobbied contemplated in Justice Douglas's concurrence in *Cammarano v. United States*, 358 U.S. 498, 515 (1959), as "a penalty on the exercise of First Amendment rights." The only government benefit at risk is the subsidy that the government chose to restrict in order to achieve its policy goals.

The Policy Requirement also does not restrict Plaintiffs' First Amendment speech outside of the scope of the Leadership Act program. This is because the organizational integrity guidelines implemented by the Agencies allow for exactly the affiliate structure that saved the funding conditions at issue in *Taxation With Representation* and *Velazquez I* and was found missing in *FCC v. League of Women Voters*, 468 U.S. 364 (1984). In this case, Plaintiffs may create affiliate organizations to receive Leadership Act funds and comply with the Leadership Act's Policy Requirement. Plaintiffs, therefore, are free to continue to remain silent or to espouse a pro-prostitution message with non-Leadership Act funds. In this way, the Policy Requirement coupled with the Guidelines only ensures that Leadership Act funds are spent within the scope of the government program—that is, on organizations that share Congress's desire to "eradicate" the practice of "[p]rostitution and other sexual victimization" because they "are additional causes of and factors in the spread of the HIV/AIDS epidemic," 22 U.S.C. § 7601(23). The Policy Requirement and Guidelines therefore impose no penalty on Plaintiffs' First Amendment rights.

The majority rejects the argument that the Guidelines save the Policy Requirement from infringing Plaintiffs' right to refrain from speaking. The majority explains that in previous cases,

affiliate provisions like the Guidelines provided an "*outlet*" that allowed organizations to say what was otherwise "impermissibly prohibited" by federal subsidy programs. Maj. Op. at **[33]** (citing *Taxation With Representation* and *League of Women Voters*). The majority argues that this case is different because an "adequate alternative channel" cannot remedy a compelled speech condition "by affording an outlet to engage in privately funded *silence*." Maj. Op. at **[34]**. This logic misses the point of "adequate alternative channels" in the government subsidy context and again fails to account for the fact that the Policy Requirement is merely a subsidy condition, not a mandate to speak.[5] Provisions allowing recipients of government funding to establish affiliate organizations to either receive the government funds or to operate exclusively with private funds are important because they remedy one way that a funding condition, although merely a funding condition, could be so coercive as to rise to the level of a direct restriction on speech. Affiliate structures prevent subsidy conditions from reaching beyond the scope of the subsidy program and restricting what an organization may or may not say outside of the scope of the program. It is in this way that subsidy conditions could become penalties on First Amendment rights equivalent to a direct restriction. *See Taxation With Representation*, 461 U.S. at 545 ("The Code does not deny TWR the right to receive deductible contributions to support its

---

[5] It is true that we have explained that "[t]aking [*Taxation With Representation*, *League of Women Voters*, and *Rust*] together, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected *expression*." *Velazquez I*, 164 F.3d at 766 (emphasis added); *accord Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 231 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007). The cases we summarized, however, all dealt with subsidy conditions that imposed negative restrictions on speech and therefore it is no surprise that the dual-structures contemplated were thought of as "adequate alternative channels" for restricted speech rather than for the right to refrain from speaking. In this case, it may be that it does not make sense to think of the Guidelines as providing an "outlet to engage in privately funded *silence*," Maj. Op. at **[34]**, but that does not affect whether affiliate provisions, like the Guidelines, prevent subsidy conditions, like the Policy Requirement, from amounting to penalties on First Amendment rights. I see no reason why an affirmative-speech subsidy condition should be treated differently.

-32-

non-lobbying activity . . . . Congress has merely refused to pay for the lobbying out of public monies.").

For the reasons explained above, the fact that an affirmative speech condition rather than a negative speech condition is at issue here does not change the analysis of whether a subsidy condition rises to the level of a direct regulation of a constitutional right. *See* discussion *supra* at **[26–33.]** Moreover, a direct restriction on speech is just as offensive to the First Amendment as is a direct compulsion to speak, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance . . . ."), *see also Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 481 (1997) (Souter, J., dissenting) ("[C]ompelling cognizable speech officially is just as suspect as suppressing it, and is typically subject to the same level of scrutiny."), and funding conditions that implicate these principles should be subject to the same analysis.[6]

This is why the District Court's dismissal of any saving effect of the Guidelines in this case because "the clause requiring Plaintiffs to adopt the Government's view regarding . . . prostitution remains intact," *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 545 (S.D.N.Y. 2008) [hereinafter *AOSI*], and, in turn, the majority's quotation of that sentence, is inexplicable. So too is the majority's assertion that "there remains, on top of [the Guidelines], the additional, affirmative requirement that the recipient entity pledge its

---

[6] While it is true that dicta in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 633–34 (1943), suggests that once the government is found to have compelled speech, it may be required to offer "even more immediate and urgent grounds" than when it restricts speech, that case does not speak to determining when a funding condition actually compels speech. The level of interest the government must demonstrate is only relevant once an infringement of First Amendment rights is demonstrated. The question in this case is whether the funding condition actually infringes First Amendment rights in the first instance; I would hold that it does not.

-33-

opposition to prostitution." Maj. Op. at **[34]**. It bears repeating: The Policy Requirement together with the Guidelines do not *require* Plaintiffs or affiliates to adopt the government's viewpoint regarding prostitution or to say anything. The Policy Requirement is a funding condition and it must be analyzed pursuant to the cases addressing "unconstitutional conditions" on government subsidies. Applying those cases, the Policy Requirement and the Guidelines do not penalize or coerce First Amendment protected conduct and do not compel speech outside of the scope of the government program. For all of these reasons, the Policy Requirement is not subject to heightened First Amendment scrutiny.

While the majority does not address the issue, Plaintiffs additionally argue that the Guidelines do not in fact provide an adequate alternative channel for protected First Amendment activity because they are too burdensome in practice. The District Court below addressed this challenge, although it did so in error by reviewing the Guidelines under heightened scrutiny. *Id.* at 548–49. We have explained that heightened scrutiny or an "undue burden" test does not apply to the question whether alternative channels like those at issue here are in fact adequate on an as-applied challenge. *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 230–32 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007). Rather, the proper question is whether any burdens on plaintiffs under the organizational integrity guidelines "in effect preclude the plaintiffs from establishing an affiliate. If so, the alternative channels are inadequate, and the plaintiffs may prevail on their as-applied challenge." *Id.* at 233. Because I would vacate the preliminary injunction and remand this case to the District Court, Plaintiffs would be free to raise any as-applied challenge to the Guidelines under the proper *Brooklyn Legal Services* standard at that time.

C

After concluding that the affirmative nature of the Policy Requirement "raises serious

-34-

First Amendment concerns," the majority ultimately asserts that heightened scrutiny applies in this case because of the "bold combination" of an affirmative-speech requirement that is also viewpoint-based. Maj. Op. at **[25, 27]**. For the reasons explained above, nothing about the affirmative nature of the Policy Requirement requires heightened scrutiny to apply. Likewise, contrary to the majority's suggestion, viewpoint-based funding conditions are not inherently "constitutionally troublesome," Maj. Op. at **[26]**, and the viewpoint-based nature of the funding condition at issue in this case does not warrant heightened scrutiny.

Funding conditions that discriminate on the basis of viewpoint are only subject to heightened scrutiny (1) when they are "aimed at the suppression of dangerous ideas," *Speiser v. Randall*, 357 U.S. 513, 519 (1958) (internal quotation marks omitted), or (2) when they are imposed in the context of a program designed to encourage a diversity of views or to facilitate private speech in a quasi-public forum context, *see Rosenberger*, 515 U.S. at 834, *Velazquez II*, 531 U.S. at 542. These classes of cases are not unrelated. The presence of viewpoint discrimination in the context of a government program that has no policy objective other than funding private speech tends to demonstrate that any attached viewpoint-based condition is primarily intended to influence behavior or to suppress certain ideas rather than to achieve a legitimate objective or to promote a government message. However, "when a spending program is not universal but limited, providing benefits to a restricted number of recipients" (as is the case here and in *Rust*), and when that program "does not create a public forum, proving coercion is virtually impossible, because simply denying a subsidy does not coerce belief, and because the criterion of unconstitutionality is whether denial of the subsidy threatens to drive certain ideas or viewpoints from the marketplace." *Velazquez II*, 531 U.S. at 552 (Scalia, J., dissenting) (internal quotation marks and citation omitted).

First, Plaintiffs do not urge, and the majority correctly does not conclude, that the Policy

-35-

Requirement is aimed at the suppression of any dangerous ideas. There is simply no evidence that Congress's purpose in enacting the Leadership Act and attaching the Policy Requirement was to suppress pro-prostitution views (or even neutrality on the issue). Congress could hardly have thought the best way to suppress support for prostitution in the public discourse would be to offer federal funds to a narrow range of groups that wished to combat HIV/AIDS, but only if they espoused an anti-prostitution position. Both the purpose and effects of the Policy Requirement are a far cry from those cases where the government condition was clearly aimed at the suppression or compulsion of speech qua speech. *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("[The tax] is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information."); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 579–80 (1983) (discussing *Grosjean*); *Speiser*, 357 U.S. at 518. Rather, the Policy Requirement is aimed at achieving Congress's legitimate goal of eradicating prostitution and reducing behavioral risks as a technique of fighting HIV/AIDS. Moreover, the organizational integrity guidelines leave Plaintiffs with precisely the same ability to remain silent or speak a pro-prostitution message if they choose. The Policy Requirement and Guidelines therefore in no way silence government criticism or contrary views on prostitution and HIV/AIDS. Only affiliates that voluntarily choose to accept Leadership Act funds must oppose prostitution; Plaintiffs and all other speakers are free to speak their own messages, including messages contradictory to those of separate affiliate groups.

With regard to the second category of cases, the Supreme Court "has recognized that the existence of a Government subsidy, in the form of Government-owned property, does not justify the restriction of speech in areas that have been traditionally open to the public for expressive activity." *Rust v. Sullivan*, 500 U.S. 173, 199–200 (1991) (internal quotation marks omitted).

-36-

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), and *Velazquez II* extended this principle to conclude that viewpoint discrimination is improper not only in traditional public fora, but also in cases where the government essentially creates a limited public forum by "offer[ing] to pay . . . private speakers who convey their own messages," *Rosenberger*, 515 U.S. at 835. Once the government has offered to pay private speakers to speak their own messages, the government may not discriminate "against speech otherwise within the forum's limitations." *Id.* at 830. One example of a subsidy program that pays private speakers but does not create a limited public forum is a program in which the government "'use[s] private speakers to transmit specific information pertaining to its own program,'" *Velazquez II*, 531 U.S. at 541 (quoting *Rosenberger*, 515 U.S. at 833), or "subsidize[s] transmittal of a message it favors," *Rosenberger*, 515 U.S. at 834. In any event, however, the "salient point" in the Supreme Court's analysis of those programs in which viewpoint discrimination has been found improper is that those programs were "designed to facilitate private speech." *Velazquez II*, 531 U.S. at 542; *see also United States v. Am. Library Ass'n*, 539 U.S. 194, 213 n.7 (2003) (plurality opinion) (explaining that *Rust* does not only apply when the government seeks to communicate a specific message).

In this case, it is plain that the government does not seek to "encourage a diversity of views from private speakers," as it did in *Rosenberger*, 515 U.S. at 834, by offering to reimburse student groups for newspaper publication costs. The purpose of the Leadership Act is not to fund a variety of non-governmental organizations interested in fighting HIV/AIDS, each of whom might have a different viewpoint on prostitution and sex trafficking. On the contrary, the Leadership Act specifically seeks to advance an anti-prostitution, anti-sex-trafficking approach to combating HIV/AIDS. *See* 22 U.S.C. §§ 7601(23), 7611(a)(12). In enacting the Leadership Act, Congress made an inherently viewpoint-based judgment concerning the allocation of public

-37-

resources for fighting HIV/AIDS, which sets the program "apart from the subsidy at issue in *Rosenberger . . .* and from comparably objective decisions on allocating public benefits," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998), at issue in cases where viewpoint discrimination was found invalid. In other words, public forum principles do not apply in this case because Congress did not authorize Leadership Act funds "in order to create a public forum for [Plaintiffs] to express themselves," *Am. Library Ass'n*, 539 U.S. at 206 (ruling that public forum principles do not apply because "[a] public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves"), but rather to achieve particular policy goals.

Likewise, the purpose of the Leadership Act is not to generally "facilitate private speech," as was the purpose of the LSC program in the *Velazquez* cases. In those cases, "Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients." *Velazquez II*, 531 U.S. at 542. The LSC program was "not advancing any particular set of values that might be diluted or distorted," *Velazquez I*, 164 F.3d at 766, by the grantee-lawyers' speech or decision not to speak. Indeed, the LSC lawyer's role specifically was to speak against the government in court in a claim for welfare benefits—the speech was "on the behalf of [the lawyer's] private, indigent client" and inherently not on behalf of the government. *Velazquez II*, 531 U.S. at 542. Therefore the case was distinguishable from *Rust* because, with regard to the LSC program, "there [was] no programmatic message of the kind recognized in *Rust*." *Id.* at 548. Here, on the contrary, instead of generally facilitating private speech, the purpose of the Leadership Act program is to combat HIV/AIDS in a particular way. The government has chosen to fund a method of combating HIV/AIDS that includes its private partners taking an anti-prostitution, anti-sex-trafficking position to the exclusion of an alternative program that would allow grantees to remain silent on the issue or to speak a pro-prostitution

-38-

message. Unlike in the *Velazquez* cases, the government's "set of values" and strategy of combating HIV/AIDS would be weakened, "diluted or distorted," *Velazquez I*, 164 F.3d at 766, if its partners were allowed to speak a pro-prostitution, pro-sex-trafficking message or to stay silent on the issue. No matter how vehemently Plaintiffs may disagree with the government's policy towards prostitution and HIV/AIDS, Congress decided that part of its anti-HIV/AIDS strategy was to "eradicate prostitution," 22 U.S.C. § 7601(23). In this case, like *Rust*, the government is allowed to specify its grantees' position on prostitution "deemed necessary for its legitimate objective[]," *Velazquez II*, 531 U.S. at 548, of reducing HIV/AIDS.

The majority rejects *Rust*'s application here because it believes the Policy Requirement "compels Plaintiffs to voice the government's viewpoint . . . as if it were their own," Maj. Op. at **[29]**. First, it must be reiterated that the Policy Requirement does not compel any speech. *See* discussion *supra* at **[26–33]**. Second, just as with the cases addressing whether subsidy conditions are coercive, none of the cases addressing allegedly viewpoint-discriminatory subsidy conditions have turned on whether an affirmative or negative speech requirement was at issue. Rather, the "salient point" for viewpoint-discrimination analysis is whether the government has effectively created a limited public forum. In this case, the government's program is not designed to "encourage a diversity of views from private speakers," *Rosenberger*, 515 U.S. at 834, nor is it intended to facilitate private speech, *Velazquez II*, 531 U.S. at 544. And "viewpoint-based funding decisions can be sustained in instances in which the government . . . 'use[s] private speakers to transmit specific information pertaining to its own program.'" *Id.* at 541 (internal citation omitted) (quoting *Rosenberger*, 515 U.S. at 833).

The majority's only additional professed rationale for casting *Rust* and its progeny aside is that the *Rust* Court stated that "[n]othing in [the challenged regulations] requires a doctor to represent as his own any opinion that he does not in fact hold" and noted that "[t]he doctor is

always free to make clear that advice regarding abortion is simply beyond the scope of the program," *Rust v. Sullivan*, 500 U.S. 173, 200 (1991). However, this observation came only in the *Rust* Court's consideration of the claim by the plaintiffs in that case that "traditional relationships such as that between doctor and patient should enjoy protection under the First Amendment from Government regulation, even when subsidized by the Government," *id.* at 200, an issue the Court did not reach. Instead, the Court concluded that because the doctors in *Rust* were not required to state any opinion that they did not hold and could simply say that abortion advice was outside of the scope of the program, the regulations did "not significantly impinge upon the doctor-patient relationship." *Id.* In this case, there is no such traditional relationship that should enjoy extra First Amendment protection, nor would any relationship as sensitive as the doctor-patient relationship be impinged if a recipient of Leadership Act funds did not actually oppose prostitution and sex trafficking, but said it did in order to receive government funding. The majority's own example of a situation in which it believes an affirmative speech requirement would be permitted suggests that the risk that a recipient would be tempted to state an opinion it did not hold—in other words, to lie—to receive government funding does not invalidate a government subsidy condition. The majority "do[es] not doubt" that the government could require grantees of a "Just Say No" to drugs program to state that they oppose drug use by children. Maj. Op. at **[30]**. But what about potential grantees who do not actually oppose drug use by children, but are tempted by the offer of funds? It cannot be that their constitutional rights are violated because as a condition of receiving federal money, they "must voice the government's viewpoint and . . . do so as if it were their own." Maj. Op. at **[29]**.

Despite all of this, the majority concedes that the government may impose an affirmative, viewpoint-based funding condition if "the government's program *is*, in effect, its message," or,

-40-

perhaps, if the message is "central" to the program. Maj Op. at **[30, 31]**. The majority, however, concludes that because the "stated purpose of the Leadership Act is to *fight HIV/AIDS*, as well as tuberculosis, and malaria[,] Defendants cannot now recast the Leadership Act's global HIV/AIDS-prevention program as an anti-prostitution messaging campaign." Maj. Op. at **[30–31]**. True enough. *See Velazquez II*, 531 U.S. at 547 ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise."). But this case is not like *Velazquez II* where the Supreme Court found that there was "no programmatic message of the kind recognized in *Rust*," *id.* at 548, that would support restricting lawyers' First Amendment rights. In this case, the government is not attempting to recast a program that was meant to merely provide funds to allow private speakers to speak their own messages into a program that could support the Policy Requirement. Rather, the Policy Requirement is obviously related to substantive policy goals of the Leadership Act—goals beyond, and different from, simply subsidizing private speech for its own sake. *See* 22 U.S.C. § 7601(23) ("Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices."); *id.* § 7611(a)(12), (a)(12)(J) (directing that the President's strategy to fight HIV/AIDS shall "make the reduction of HIV/AIDS behavioral risks a priority of all prevention efforts by . . . eliminat[ing] . . . the sexual exploitation of women and children"). This is not a case where the funding condition is so attenuated from the purpose for which the public funds were appropriated as to invalidate the condition. *Compare South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987) (concluding that while "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs," "the condition imposed by Congress is directly related to one of the main purposes for which highway funds are expended—safe interstate travel" (internal quotation marks omitted)) *with id.* at 213–14

-41-

(O'Connor, J., dissenting) ("In my view, establishment of a minimum drinking age of 21 is not sufficiently related to interstate highway construction to justify so conditioning funds appropriated for that purpose.").

Moreover, the majority cites no support for its implication that the purpose of the Leadership Act must be examined at the broadest possible level of generality to determine whether public-forum principles apply to this case. *See* Maj. Op. at **[30–31]** ("The stated purpose of the Leadership Act is to *fight HIV/AIDS*, as well as tuberculosis, and malaria."). There is no reason why a government subsidy program must actually *be* a messaging campaign or even have a message as a "central" component in order to support a viewpoint discriminatory condition that is germane to legitimate substantive goals of the program. *Rust*, *Rosenberger*, and *Velazquez II* did not address the size of, number of purposes of, or any potential "subsidiary issue[s]," Maj. Op. at **[31]**, in the government programs in which those cases suggested that viewpoint discriminatory conditions would be permissible.

The majority also questions the Leadership Act's commitment to partnering with groups that oppose prostitution as a means of combating HIV/AIDS because the Policy Requirement specifically exempts four groups from compliance: the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and United Nations agencies, *see* 22 U.S.C. § 7631(f). One of these organizations, the International AIDS Vaccine Initiative, is focused on the development of an AIDS vaccine. The fact that Congress determined that while it generally only wished to partner with groups that opposed prostitution, it nevertheless wanted to fund research for an AIDS vaccine does not call into question Congress's desire to eradicate prostitution as part of its efforts to combat HIV/AIDS. Congress may simply have determined that AIDS-vaccine research was an even more important priority. The three remaining groups are "public international organizations" in

-42-

which the United States participates and which are made up primarily or exclusively of sovereign states. *See generally id.* § 288 (discussing "public international organizations"). Again, nothing about the fact that Congress chose to make Leadership Act funds available to these international organizations without requiring them to comply with the Policy Requirement undermines Congress's strong desire to only partner with groups that share its opposition to prostitution. Congress may have determined that the goals of the Policy Requirement were outweighed by sensitive diplomatic considerations. The majority suggests that if Congress truly wished to support "anti-prostitution advocacy . . . it could, of course, simply choose not to fund these organizations." Maj. Op. at **[32]**. But the decision whether to withhold Leadership Act funds from these organizations or instead to provide an exemption from the Policy Requirement is precisely the kind of policy judgment that Congress, not the courts, is entitled to make. *Cf. Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("Congressional selection of particular entities or persons for entitlement to this sort of largesse is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find." (internal quotation marks omitted)).

Finally, the majority relies on the fact that "prostitution in the context of the international HIV/AIDS-prevention effort[] is a subject of international debate" and notes that it concerns a "controversial public issue," to argue that Plaintiffs' speech rights are important. Maj. Op. at **[27 –28 & n.4]**. The majority also rejects Defendants' argument that strict scrutiny should not apply to the Policy Requirement because it implicates foreign affairs. But the substantive validity or controversial nature of Plaintiffs' position on prostitution and any foreign affairs repercussions for the government both are not determinative of whether the Policy Requirement is constitutional pursuant to the "unconstitutional conditions" doctrine and the viewpoint-

discrimination cases discussed above. Because I conclude that the Policy Requirement is not subject to heightened scrutiny in any event, I need not reach these arguments. Nevertheless, I believe my observations sufficiently dispose of them.

For all of the reasons explained above, I conclude that the Policy Requirement's viewpoint-based nature is permissible in this case and that it is not subject to heightened judicial scrutiny.

IV

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, ___,129 S. Ct. 365, 374 (2008). We review a district court's grant of a preliminary injunction for abuse of discretion. *Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 100 (2d Cir. 2008). "A district court abuses its discretion when (1) its decision rests on an error of law . . . ." *Mullins v. City of New York*, 626 F.3d 47, 51 (2d Cir. 2010) (internal quotation marks omitted). The District Court in this case granted Plaintiffs' request for a preliminary injunction because it concluded that the Policy Requirement "would not survive heightened scrutiny, and also impermissibly compel[s] speech" and therefore it "violate[s] the First Amendment." *AOSI*, 570 F. Supp. 2d 533, 549 (S.D.N.Y. 2008). For the reasons explained above, I conclude that the District Court erred because the Policy Requirement is not subject to heightened scrutiny, does not compel speech, and does not violate the First Amendment. Furthermore, because Congress's decision to enact the Policy Requirement is an entirely rational exercise of its powers pursuant to the Spending Clause, I would conclude that

-44-

Plaintiffs have not established a likelihood of succeeding on the merits of their claim that the Policy Requirement is unconstitutional. Accordingly, I would vacate the preliminary injunction and remand the case for any further proceedings consistent with my views.[7]

* * *

With today's decision, the majority unnecessarily splits from the Court of Appeals for the District of Columbia Circuit on this very issue. In 2007, the D.C. Circuit Court of Appeals rejected an almost identical challenge to the Leadership Act by a potential grantee that refused to adopt a policy opposing prostitution. *See DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 477 F.3d 758 (D.C. Cir. 2007). The Court explained that the Act's viewpoint-based restrictions were permissible because "the government has not created a program to encourage private speech," as it did in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), and *FCC v. League of Women Voters*, 468 U.S. 364 (1984), but rather, "as in *Rust*, the government's own message is being delivered." *DKT Int'l*, 477 F.3d at 762 (internal quotation marks omitted). While the organizational integrity guidelines were not yet in place when *DKT International* was decided, the Court also rejected the plaintiff's argument that, pursuant to *Rust*, funding restrictions may only apply to particular projects and not to recipients in general. The Court explained that there was no constitutional violation in the Leadership Act because "[n]othing prevents [the plaintiff] from itself remaining neutral and setting up a subsidiary organization that certifies it has a policy opposing prostitution. . . . The parent organization need not adopt the

---

[7] The District Court did not reach Plaintiffs' vagueness claims because the Court granted the preliminary injunction on the grounds that the Policy Requirement and Guidelines violated the First Amendment because they "would not survive heightened scrutiny, and also impermissibly compel speech," *AOSI*, 570 F. Supp. 2d at 549. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Because the majority also does not reach Plaintiffs' vagueness challenge, I do not pass upon it here.

policy." *Id.* at 763. Finally, the Court also rejected the plaintiff's compelled speech challenge, distinguishing *Barnette*, *Speiser*, and *Wooley* from the case before it:

> In each of those cases, the penalty for refusing to propagate the message was denial of an already-existing public benefit. None involved the government's selective funding of organizations best equipped to communicate its message. Offering to fund organizations who agree with the government's viewpoint and will promote the government's program is far removed from cases in which the government coerced its citizens into promoting its message on pain of losing their public education, *Barnette*, 319 U.S. at 629, or access to public roads, *Wooley*, 430 U.S. at 715.

*DKT Int'l*, 477 F.3d at 762 n.2.

Furthermore, and as explained above, I believe that the "unconstitutional conditions" doctrine and the cases addressing viewpoint discrimination in the government subsidy context provide the appropriate framework for analyzing this case. I conclude that those cases demonstrate that the Policy Requirement is constitutional. Nevertheless, it has been said that the "unconstitutional conditions" doctrine is a "troubled area of [Supreme Court] jurisprudence," *Rust*, 500 U.S. at 205, and that the Supreme Court's unconstitutional conditions cases "seem a minefield to be traversed gingerly," Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1415–16 (1989). Because the majority today, however, does more to further complicate the doctrine than to clarify it, the Supreme Court may wish to grant certiorari to set us straight.

I respectfully dissent.